THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* STANLEY J. BAUER, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* EUGENE J. SROKA, Appellant.

Fourth Department, September 11, 1969.

464

*Peter L. Parrino* for Stanley J. Bauer, appellant.

*Vincent E. Doyle* for Eugene J. Sroka, appellant.

*Michael F. Dillon, District Attorney (Peter J. Notaro* of counsel), for respondent.

DEL VECCHIO, J. P. These are joint appeals from judgments of the County Court of Erie County rendered June 19, 1968 upon verdicts (1) convicting both defendants of the crime of conspiracy, and (2) convicting defendant Bauer of the crime of attempted grand larceny first degree, allegedly committed in December, 1965.

The indictment charged both defendants in the first count with conspiracy to commit the crimes of bribery and grand larceny, and in the second count with the crime of attempted grand larceny by false pretenses. The jury returned a verdict of not guilty on the second count against defendant Sroka.

In November, 1965 a shoplifter had been apprehended and brought to the office of Carl Gmerek, a 22-year-old office manager of a food store, and after some discussion Gmerek agreed to "forget" the whole incident upon payment to him of $500. Upon reflection, the shoplifter disavowed the scheme and reported it to the District Attorney, who arranged for payment of the money to Gmerek. When the money was paid Gmerek was arrested for extortion. Although Gmerek had retained counsel he inquired of defendant Sroka, a security officer in his store, if he knew anyone who could help him. The next day Sroka informed Gmerek that defendant Bauer, an ex-State Senator, had great influence and could perhaps have the charge dropped but it might involve paying off some people. He arranged for Gmerek to meet Bauer. At this meeting held on December 3, 1965, attended by all three, Bauer and Gmerek had a discussion in which Sroka did not participate. Gmerek was advised to discharge his attorneys; Bauer "guaranteed" he could produce a satisfactory result because of his influence with certain public officials and agreed to make an inquiry to determine how much of a pay-off might be required. At that meeting Gmerek intended to go along with Bauer's sug-

gestion to turn over money to resolve or drop the pending charges. Before the scheduled second meeting, Gmerek upon reflection concluded that Bauer was a name dropper who could not do anything for him and advised Sroka he had reconsidered Bauer's proposition, decided to decline his help and withdrew from any arrangement. Sroka did not attempt to induce Gmerek's continued participation in the scheme. Thereafter Gmerek revealed all these events to his attorneys, who advised the District Attorney, and Gmerek agreed to co-operate with him in an investigation of the defendants. By prearrangement with the District Attorney, Gmerek's office was equipped with a hidden microphone and Sroka was called to his office. Gmerek asked him whether Bauer would " take him back on ". Sroka indicated that Bauer had become very displeased with Gmerek for backing out of the original deal because he had done three or four days of research on his case. He did however arrange for another meeting. The record shows no other meeting between Gmerek and Sroka, only the one meeting at which all three were present, and no other meeting between Sroka and Bauer. Gmerek, on the other hand, conferred with Bauer on two more occasions, during both of which he was equipped with a concealed transmitter tuned to a receiver in the District Attorney's car. At the second meeting Bauer advised Gmerek that he had discussed the extortion charge with the District Attorney and certain other people (when in fact the record reveals he had never done so); that the charges could be favorably disposed of for $3,000 but he would try for $2,000, and he requested Gmerek to bring that sum in cash at their next meeting. Gmerek was furnished the money in marked bills by the District Attorney, and after it was given to Bauer the latter was arrested. These conversations, transmitted to the District Attorney's car, were taken down in shorthand by a court stenographer. Both the shorthand notes and the transcripts are a part of the record.

The verdict of guilty against both defendants on the conspiracy count and of acquittal in favor of Sroka on the attempted grand larceny count is a clear indication that the conspiracy conviction was based upon the three-way conversation of December 3 in which Bauer expressed his intent to bribe. This proof however, as will be hereinafter demonstrated, was not sufficient to support the conviction on that count.

It is well established that to constitute the crime of conspiracy there must be a corrupt agreement between two or more individuals entered into with a criminal intent to do an unlawful act either as a means or an end, followed by an overt act to effect the object of the agreement. (Penal Law, §§ 580,

583; *People* v. *Harris,* 294 N. Y. 424, 433; *People* v. *Tavormina,* 257 N. Y. 84; *People* v. *Flack,* 125 N. Y. 324.)

Our examination of the record fails to reveal the existence of either necessary element of the crime. Referring to the first and only three-way meeting of December 3, no illegal combination was formed since the only "agreement" made was one between Bauer and Gmerek to meet again the following week. At this meeting Bauer attempted to persuade Gmerek of his influence and promised to talk to certain people to see how much money was needed to effect a bribe. Even assuming that an agreement to bribe could be implied from the acts and conduct of the parties, together with Gmerek's testimony that he was willing to do anything to get out of his trouble, and that as he left the meeting it was his intention to turn over money to Bauer to resolve or have the charge dropped, there is no proof that Gmerek delivered any money or that Bauer attempted to bribe anyone before the unlawful agreement had been abandoned; consequently there was no overt act in furtherance of such an agreement sufficient to support the charge of conspiracy to bribe. (*People* v. *Hines,* 284 N. Y. 93, 113.)

The next contact between Sroka and Gmerek was when the latter announced his retirement from any dealings with Bauer. The "plan" was revived when the District Attorney requested Gmerek to assist in investigating defendants. From this point on Gmerek could not have had the requisite criminal intent to enter into a conspiracy to bribe because he was no longer relying upon Bauer's representations. (*People* v. *Flack, supra; People* v. *Powell,* 63 N. Y. 88.)

Although Sroka arranged for Gmerek to meet Bauer again, there is no proof that he ever participated in any unlawful agreement and therefore he could not be convicted of conspiracy. If Sroka could not be convicted of conspiracy, Bauer, his alleged coconspirator, likewise could not be convicted of conspiracy. In *People* v. *Hamilton* (165 App. Div. 546) the court held that a conspiracy involves of necessity the joint agreement of at least two parties and that it is necessary to prove the guilt of both in order to sustain the conviction of one. In *People* v. *Kuland* (266 N. Y. 1) it was held that upon such an indictment against two persons an acquittal or reversal as to one is an acquittal or reversal as to the other. (See, also, *People* v. *Chaplin,* 8 A D 2d 286.)

It follows that the judgment convicting both appellants of the crime of conspiracy should be reversed and the first count of the indictment dismissed.

With reference to the second count, defendant Bauer contends that his conviction for attempted grand larceny based on the events surrounding the payment of the $2,000 cannot stand. He argues, as he did at the trial, that since it was legally impossible for him to have consummated the crime of grand larceny, he cannot be guilty of an attempt, relying on *People* v. *Rollino* (37 Misc 2d 14) and cases cited therein. We disagree with this contention.

At the December 3 meeting Bauer, among other things, advised Gmerek that he had influence with the District Attorney and a few Judges; that he could help him out; that Gmerek was to drop his attorneys; that he would guarantee a plea to a lesser offense and probation; that new attorneys would be appointed by the District Attorney. When asked how much it was going to cost, Bauer replied, "Carl, it's a vicious chain. There is many, many people involved. We might have to pay off the D. A., the Assistant D. A., the Judge." He stated he would talk to certain people to see how much was needed and fixed the date for the next meeting. These statements certainly are expressions of intent to bribe but subsequent events disclosed that his actual intent was not to bribe but to defraud by obtaining money from Gmerek by false pretenses, and the crime of larceny by false pretenses could have been, and probably would have been, consummated if his design had not been interrupted by a change of heart by Gmerek, a fact unknown by Bauer. However, before the second meeting Gmerek discussed Bauer's representation with his employer, and decided to withdraw from the arrangement, which was later revived by the District Attorney, thus preventing the consummation of the crime of larceny.

The transcript of the recorded conversation between Bauer and Gmerek at the second meeting on December 19 reveals that Bauer, among other false statements, said that he was running City Court; that he went there and talked with the Assistant District Attorney who said he would do anything the boss says; that he had talked with the District Attorney who was asking for $3,000 and that he went to County Court and talked with the County Judge who guaranteed probation. After making all of these false statements, he said, "I will tell you how confident I am, I will give you a promissory note." He then twice said that he could settle the whole case for $3,000 but he did not want to go in with three, he would rather go in with two, but guaranteed it would not cost over $3,000. He then requested Gmerek to bring $2,000 in cash on December 22 and said that it would be nice to give this money to the District

Attorney before Christmas. He also impressed upon him the urgency of secrecy.

The People called as witnesses: the Assistant District Attorney assigned to City Court, who testified that he had no conversation with Bauer in December, 1965 concerning Gmerek's case and never told him he would do anything the boss says; the County Judge, who testified that during the month of December, 1965 he had no conversation with Bauer and never told him that he would guarantee probation for Gmerek; and the District Attorney, who testified that the only time he talked with Bauer was in a telephone conversation on December 17, 1965 which was recorded on tape. During that conversation Bauer never offered him any money, never attempted to influence him with respect to Gmerek and in fact never discussed with him the charges pending against Gmerek.

On December 22 Gmerek handed Bauer $2,000 in marked money furnished by the District Attorney, and pursuant to a prearranged signal Bauer was arrested.

The fact that Gmerek did not rely upon Bauer's misrepresentations but turned over the money with the knowledge and consent of the owner and with full knowledge of the falsity of Bauer's statements made it impossible to charge defendant with larceny. We are satisfied, however, that the intended victim's lack of reliance upon misrepresentations by the defendant does not preclude conviction of attempted grand larceny because of the legal impossibility of completion of the crime of grand larceny by false pretenses. Cases decided in this and other jurisdictions lead us to this conclusion.

An attempt to commit the crime of larceny by false pretenses consists of an intent to commit the crime coupled with an ineffectual overt act towards its commission. The making of fraudulent misrepresentations calculated to induce the victim to part with his money has been held to constitute a specific overt act. (*People* v. *Spolasco,* 33 Misc. 22; *People* v. *Anderson,* 55 Cal. 2d 655, cert. den. 368 U. S. 931; *State* v. *Wolf,* 168 Minn. 505.) It is no defense that the consummation of the larceny was prevented or became impossible as the result of a factual impossibility unknown to defendant nor that the victim was not deceived by and did not rely upon the misrepresentations. (*People* v. *Gardner,* 144 N. Y. 119; *People* v. *Moore,* 142 App. Div. 402, affd. 201 N. Y. 570; *People* v. *Teal,* 196 N. Y. 372, 382; *People* v. *Boord,* 260 App. Div. 681, affd. 285 N. Y. 806; *People* v. *Camodeca,* 52 Cal. 2d 142; *Franczkowski* v. *State,* 239 Md. 126; see, generally, Ann. 6 ALR 3d 241.) To sustain a conviction for an attempted grand larceny by false pretenses,

it is not necessary that every element constituting grand larceny be present. (*People* v. *Gardner, supra.*)

In the *Gardner* case the defendant had been convicted of attempted extortion although the intended victim knew, at the time the money was paid to defendant, that the threats made to induce payment were groundless and although the payment was not actuated by any fear on the part of the victim. There, as in the present case, the victim had consulted the police prior to the time of payment and was acting for the purpose of making an arrest of the defendant possible, not as the result of threats or promises by the defendant. The Court of Appeals concluded that the absence of the victim's reliance upon the defendant's threats did not make the conviction for attempted extortion invalid. '' The threat of the defendant was plainly an act done with intent to commit the crime of extortion, and it tended, but failed, to effect its commission, and therefore the act was plainly within the statute an attempt to commit the crime. The condition of Mrs. Amos' mind was unknown to the defendant. If it had been such as he supposed, the crime could have been and probably would have been consummated. His guilt was just as great as if he had actually succeeded in his purpose. His wicked motive was the same, and he had brought himself fully and precisely within the letter and the policy of the law. This crime as defined in the statute depends upon *the mind and intent of the wrongdoer, and not on the effect or result upon the person sought to be coerced.''* (p. 124, emphasis supplied). (See, also, *People* v. *Moran,* 123 N. Y. 254.) That the same rule applies to attempted grand larceny by false pretenses is made clear by the statement in *Gardner* (p. 126) : '' It has been held in several cases that there may be a conviction of an attempt to obtain property by false pretenses, although the person from whom the attempt was made knew at the time that the pretenses were false, and could not, therefore, be deceived.'' This rule was reiterated in *People* v. *Teal* (196 N. Y. 372, 382) where, referring to the *Gardner* and *Moran* cases, the court said: '' It is said that they are authorities for the doctrine that the question whether a person has made an attempt to commit a crime depends upon the mind and intent of the actor and not upon the result of the act. That is quite true as regards the crimes of larceny and extortion, which were the subjects of discussion in those cases ''. More recently, Justice ROGER J. TRAYNOR, writing for the Supreme Court of California in *People* v. *Camodeca* (*supra,* pp. 146–147) stated: '' 'The overwhelming weight of authority in this country [cases cited] holds that in a prosecution for attempted grand theft by

false pretenses it is not necessary that the defendant's intended victim be deceived by the falsity of the representations made to him [authorities cited].''

The present case falls squarely within this principle. Defendant Bauer made false representations to Gmerek for the purpose of obtaining a sum of money which was in fact received by him from the intended victim. The fact that the victim was not deceived was unknown to the defendant; while this lack of deception prevented completion of the crime of grand larceny by false pretenses it did not render invalid the conviction for the lesser crime of attempted grand larceny. Bauer's wicked motive was unaffected by Gmerek's knowledge; his intention and conduct were criminal when he received the $2,000 payment as well as when he made the false representations and promises to Gmerek which started the chain of criminal events. The evidence of defendant Bauer's unsuccessful efforts to obtain money from Gmerek by fraudulent misrepresentations as to the bribing or influencing of public officials amply supports the conviction for the crime of attempted grand larceny by means of false pretenses.

*People* v. *Rollino* (37 Misc 2d 14, *supra*) relied on by defendant, has no application to the instant case; it does not consider attempted larceny by false pretenses and does not discuss the line of cases headed by *People* v. *Gardner* which, in our opinion, is compelling authority for affirmance.

The dissenting Justice would reverse this count upon the ground that there is no showing beyond a reasonable doubt that Bauer possessed any intent to commit larceny by false pretenses. It should be noted that no such point was made in this court by defendant either in his brief or oral argument and therefore respondent has had no opportunity to answer this point. In any event, the jury was fully and adequately instructed that the alleged false representations must be found to have been made *with intent* to defraud in order to convict. The court read the second count as it appears in the indictment. Briefly stated, it accused both defendants of the crime of attempted grand larceny first degree in that between December 3 and December 22 each of them *with intent* to cheat and defraud Gmerek made false pretenses to obtain $2,000 and that Bauer on December 22 obtained $2,000 from Gmerek by means of false representations *with intent* to cheat and defraud Gmerek. The court then defined larceny and charged that, '' An act done with intent to commit a crime, intending but failing to effect its commission, is an attempt to commit that crime.'' It also instructed the jury as follows: '' Intent can be defined as

that mental operation by which a person desires to accomplish a certain result. Like every other mental function it is a secret and silent operation, invisible to the human eye but which can be ascertained from the actions and conduct of the person whose intent is the subject of inquiry and the surrounding circumstances thereto ", and "In determining the question of fact from circumstantial evidence there are two general rules to be observed. First, the theory of guilty must flow naturally from the facts proved and be consistent with all of them. Second, the facts proved must exclude to a moral certainty every theory but that of guilt and not only must all of them be consistent with and point to guilt but they must be inconsistent with innocence ", and finally: "If you find beyond a reasonable doubt that defendant Bauer made certain representations to Gmerek knowing them to be false *with the intent* to defraud Gmerek of $2,000 and that the defendant Sroka was united with Bauer in these acts as an accomplice, then you may find both defendants guilty of this count."

Clearly, the issue of intent to obtain money by false pretenses was properly submitted as a question of fact for the jury to be determined from all the circumstances. "The question of intent can never be ruled as a question of law but must always be submitted to the jury." (*People* v. *Flack,* 125 N. Y. 324, 334; cf. *People* v. *Monroe,* 64 App. Div. 130.) Upon the record as a whole we cannot say that the jury's resolution of this issue by finding that Bauer intended to defraud Gmerek by false pretenses was not supported by the proof.

The dissent relies heavily upon Gmerek's testimony that during the conversation of December 19 Bauer offered him a receipt and a promissory note, which he refused. Defense counsel on summation also read the same questions and answers quoted in the dissenting opinion in arguing that Bauer had no larcenous intent. Obviously the jury did not accept this argument, no doubt for the reason that there was nothing in the transcript of the recorded conversation to show that a receipt was offered or that a note was refused. In light of this fact, the jury could well have rejected these two statements. Reconciliation of the testimony and the recorded conversation, a determination of which should be accepted and which rejected the truthfulness and accuracy thereof, were exclusively for the jury, and a court should not substitute its determination for that of the jury. It should also be observed that the conversations between Bauer and Gmerek were had in December, 1965 and that the trial was held in May, 1968. The questions and answers quoted in the

dissenting opinion are part of the cross-examination relating to the conversation had on December 19. When Gmerek was asked on cross-examination, in testing the accuracy of his testimony, whether some of the things he said in his testimony "might have been words that came out of your mind without actually having occurred", he replied that it was difficult to remember verbatim exactly what had happened two and a half years ago. Finally, the jury could not only have rejected those statements but could also have found that Bauer's stated proposed use of the money and his promise to give a note were false inducements to encourage Gmerek to deliver the cash on December 22, that these false inducements together with the misrepresentations made on December 19 evidenced an intent to defraud Gmerek of $2,000 for his own personal use and not to bribe anyone. It is inconceivable that Bauer would bribe a public official to help out a stranger without benefit to himself.

The theory we advance to justify the conviction is not reliance upon the testimony of Gmerek, as claimed in the dissent, but reliance upon the recorded false statements which came from the lips of Bauer. Resort to falsehood affords of itself a presumption of evil intentions and has always been considered proper evidence upon the question of guilt or innocence. (Cf. *People* v. *Conroy*, 97 N. Y. 62, 80.) This is the same theory upon which the District Attorney decided to investigate the defendant by using a transmitter and receiver to record Bauer's statements, as revealed by the following question and answer on cross-examination: Q. "Now, at that time were you then of the opinion that if anything was up involving Bauer, Sroka, that it was a larceny from Gmerek? They were trying to take money under false pretenses?" A. "Yes, sir. He was claiming he was going to pay off me and Judges and everybody else. I just don't believe that he was going to do that."

The transcript of Bauer's recorded statements made on December 19 unquestionably shows his evil intention to defraud Gmerek. This is not overcome by his braggadocio statement that, "I will tell you how confident I am, I will give you a promissory note", and his nebulous statement that, "I will give you a promissory note if I don't deliver it, you collect on demand, two thousand dollars from me."

The transcript of the recorded conversation of December 22 shows that Bauer neither offered a receipt nor gave a promissory note at the time the money was delivered even though he had pencil and paper. At that time he wrote Gmerek's name and address on a slip of paper for himself and his telephone

number on a slip of paper for Gmerek, but he did not write out the promissory note he promised to give Gmerek on December 19.

Lastly, the District Attorney testified on cross-examination that in 1965 there was a policy of accepting reduced pleas in better than 75% of the felony indictments handed down by the grand jurors. This policy resulted from the fact that approximately 800 indictments were returned annually in Erie County but by using the available courtrooms to maximum capacity only about 180 cases could be disposed of by trial.

From the recorded conversations and the testimony of the public officials the jury could have found that Bauer never intended to give a promissory note or to return the money and never intended to give the $2,000 to the District Attorney but intended to defraud Gmerek by taking advantage of any amelioration of the charges or punishment which might accrue to young Gmerek by virtue of the crowded condition of the court calendar. We conclude that the record amply supports the factual finding of the jury that Bauer made false representations with intent to defraud. Accordingly, the conviction for attempted grand larceny should be affirmed.

The dissent also relies upon the argument presented by defendants that prejudicial error was committed in allowing the jury to report the verdict without having had certain requested testimony read.

It appears that the jury retired to commence deliberations at 12:18 P.M. At 5:03 P.M. they returned for further instructions on a question of law. After the court had complied with that request the foreman asked that Gmerek's testimony of the December 3 conversation be read. (This was the conversation had at the meeting between Gmerek, Bauer and Sroka in which Bauer stated that he would effect a bribe.) The testimony requested was vital to the consideration of whether a conspiracy to bribe was being formulated. One of the stenographers who took part of that testimony was not in court and the Judge said: "Apparently one of the other stenographers took that portion. We will have him look it up. In the meanwhile, you can retire to the more comfortable quarters of the deliberation room unless you have another question." It should be noted that the court did not instruct the jury that it must continue its deliberations without the requested testimony (as in *People* v. *Westerman,* 7 A D 2d 943), did not coerce the jury to return a verdict in its absence (as in *People* v. *Lorenz,* 16 A D 2d 135) and did not refuse to answer the jury's question (as in *People*

v. *Gonzalez,* 293 N. Y. 259). Shortly thereafter, at 6:07 P.M., the jury returned to the courtroom to announce its verdict. Before the verdict was reported neither the court nor any attorney referred to the jury's request for the rereading of the testimony and no inquiry was made whether the jury had revoked that request. The testimony was then available since the stenographers had located it and were both present and ready to read it. However, defense counsel made no objection to the recording of the verdict as the jury was then ready to announce it, and to the discharging of the jury, and made no mention of the fact that the requested testimony had not been reread. It seems that by failing to raise the question at this point, when it might well have been obviated, defendant has waived the right to have it reviewed on appeal. (Cf. *People* v. *Friola,* 11 N Y 2d 157; *People* v. *Murphy,* 135 N. Y. 450, 455.)

It may well be that, before the verdict was received, the court or one of the attorneys should have notified the jury that the requested testimony was available and inquired whether they no longer desired it to be read. It is fair to assume that if such an inquiry had been made the reply would have been that the jurors were in agreement that the requested testimony was no longer necessary to reach a verdict. Moreover, in view of all the foregoing circumstances, we do not believe the procedure followed warrants a new trial on the attempted grand larceny count, particularly since the requested testimony was vital only to the conspiracy count, and that count is now being dismissed. Not every failure to comply with a jury's request for information during deliberation is reversible error. (*People* v. *Miller,* 6 N Y 2d 152, 156; *People* v. *La Marca,* 3 N Y 2d 452, 461.) The test is whether the failure to respond seriously prejudiced the defendant. (*People* v. *Jackson,* 20 N Y 2d 440, 454–455; *People* v. *Cooke,* 292 N. Y. 185, 188.) Since the testimony relating to the December 3 conversation was vital to a proper consideration of whether there was a conspiracy to bribe but did not " pertain to a vital point " (as in *People* v. *Gezzo,* 307 N. Y. 385, 396) and was not crucial (as in *People* v. *Lorenz, supra*) as regards the attempted grand larceny count, which was established by the conversations of December 19 and 22, we perceive no reversible error in this aspect of the case. The trial was long and the issues were complex; as the court stated in *People* v. *Kingston* (8 N Y 2d 384, 387): " Errors are almost inevitable in any trial, improprieties almost unavoidable, but the presence of one or the other furnishes no automatic signal for reversal and retrial."

We have examined all other contentions raised by defendant Bauer concerning the second count of the indictment and have found them to be lacking in merit.

The judgment of conviction of the crime of conspiracy as to defendants Bauer and Sroka should be reversed on the law and facts and the first count of the indictment dismissed, and the judgment of conviction of defendant Bauer of the crime of attempted grand larceny, first degree, should be affirmed.

GABRIELLI, J. (dissenting). I dissent from so much of the majority opinion as affirms the conviction of defendant Bauer of attempted grand larceny, first degree.

I do, however, concur with the result reached by the majority for a reversal of the convictions on the conspiracy count, but on the sole ground there was no evidence of any conspiratorial agreement. At the only three-way meeting of the alleged conspirators no illegal combination was formed, since the only '' agreement '' made was between Bauer and Gmerek to meet again the following week. At this precise moment, the alleged conspiracy did not exist and the record is completely devoid of any other evidence as to the formation of a conspiracy.

I, must, however, disagree with the conclusion reached by the majority which affirms Bauer's conviction of attempted grand larceny.

It is conceded that the consummated crime of larceny by false pretenses could not have been committed. The majority agree that at the time the $2,000 was given to Bauer, Gmerek was not relying on any representations made by Bauer nor was he deceived thereby, and they further admit that upon these facts it was '' impossible to charge defendant with larceny ''. They would nonetheless find criminal responsibility of an attempt to commit larceny because of his false statements as to his influence and as to his having talked with certain officials, and they conclude that he thus intended to cheat Gmerek out of the $2,000.

To put the case in proper perspective we approach the facts as they relate to the charge of attempted grand larceny, first degree by false pretenses. It is undisputed that since Gmerek handed over the $2,000 to Bauer with the consent of both the District Attorney and Gmerek there could have been no common-law larceny since such a charge is unsupportable if the owner consents to the taking. If a completed act cannot as a matter of law constitute a crime (such as common-law larceny) it follows that there cannot be a conviction of an attempt to commit the crime (*People* v. *Jaffe*, 185 N. Y. 497; *People* v. *Teal*, 196 N. Y. 372; *People* v. *Rollino*, 37 Misc 2d 14). However, the

indictment here charges an attempted grand larceny, by false pretenses and our review of the evidence must, therefore, be directed to determine whether there was an *intent to steal* and whether there was an ineffectual act toward its commission.

Defendant's plea of not guilty was a denial of every allegation in the indictment (Code Crim. Pro., § 338). At the conclusion of the People's case, defendant unsuccessfully moved for a dismissal on the ground there had been a failure to make out a prima facie case. This motion, of course, raised the vital issue of intent. All dismissal motions were renewed and denied upon the close of the evidence, to which exception was taken. By his notice of appeal from the judgment as well as from all orders made during the trial, defendant's motion for a dismissal and claim of failure to make out a prima facie case are not only preserved but require us to pass upon the critical question of intent (*People* v. *Wrieden,* 299 N. Y. 425; *People* v. *Adelstein,* 9 A D 2d 907).

Although we are reversing the conviction on the conspiracy count (which contained a charge of an intent to bribe), because of a failure to prove a conspiratorial *agreement*, we are compelled to resort to conjecture as to the jury's basis for the verdicts of guilty on both the conspiracy and attempted larceny counts. If on the conspiracy count they found an intent to bribe certain officials, it would be anomalous for them to have also found Bauer to be possessed of an intent to steal from Gmerek. If he intended to bribe public officials, it could not also be found he intended to steal from Gmerek. It cannot be determined on which ground the jury returned its " general " verdict on the first count. Where a multicount indictment is submitted to a jury resulting in multiple verdicts and the evidence is insufficient to justify submission as to any one count, " the conviction must be reversed since it cannot be known on which ground the jury based its verdict " (*People* v. *Sullivan,* 173 N. Y. 122, 126–127). Hence, if we *presume* the jury found a conspiracy to bribe, the verdict on the second count is fatally defective and a new trial must follow (*People* v. *Standish,* 5 A D 2d 726). By a reversal of the first count, we cannot clear the way to affirm the second count. A view that we might assume the jury found a conspiracy to defraud is subject to what has been condemned as unwarranted reliances upon ambiguous circumstantial evidence. We have held that the convictions on the first count must be reversed but the point is that we have no way of knowing what, in fact, the jury found Bauer's intent to be. In this connection it should be noted that the only

direct evidence of Bauer's intention was his announced plan to bribe certain public officials. Inconsistency and uncertainty abound where certainty is required.

There has been no showing beyond a reasonable doubt that Bauer possessed any intent to commit larceny by false pretenses. The majority cite authorities for the proposition that a conviction of attempted larceny may be sustained if two requirements are met, viz., (1) an intent to commit the crime of larceny and (2) an ineffectual overt act toward its commission. The critical element lacking is any evidence of an intent to steal from Gmerek, at whose request the entire chain of events was set in motion. In this connection we take note of Gmerek's testimony presented as part of the People's case and given after he stated he had reviewed his testimony and the case with the prosecution. Regarding his conversation with Bauer he was asked:

"Q. All right. Did you ask for any receipt? [for the $2,000] A. No sir.

"Q. Did he offer any receipt? A. Yes, sir, he did offer a receipt.

"Q. And what did you do or say at that point? A. Well, I believe that he had offered me a promissory note, and I refused it and that was the extent of it.

"Q. What did you say when you refused the promissory note? A. What did I say?

"Q. Yes. A. I don't recall.

"Q. Do you recall what he said at that particular junction? A. Well, he said, 'What happens if I die or—?' He says, 'I might die tomorrow,' or something to that nature.

"Q. And he was willing to write this note out in your presence, was he, and give it to you? A. It was my belief that this was his intention." [Bracketed matter supplied].

When again queried concerning any conversation relating to money, he testified as follows:

"Q. All right. Then what was said specifically now; I will ask you that question again; on the 19th, in regard to the two thousand dollars? A. Well, he offered to give me a promissory note on the two thousand dollars, and if he didn't come across, I would get the two thousand dollars back."

The majority would hold that the quoted testimony showing Bauer's offer of a receipt or a promissory note as a money back guarantee and his announced intent to bribe public officials could be disregarded by the jury in order to find an intent to steal from Gmerek. With this, I disagree since there is neither any direct evidence of any such intent nor any proper circum-

stantial evidence thereof. That a promissory note was not offered on December 22 does not alter the admitted fact that it was offered by Bauer and refused by Gmerek, on December 19. Any finding of guilt on this second count disregards the very reasonable hypothesis that Bauer asked for and received the money for the purpose of offering it to certain officials.

Adopting the theory advanced by the majority that this " crime as defined in the statute depends upon the mind and intent of the wrongdoer," there is a complete lack of evidence to show an intent *to steal*. Conversely, a reading of the quoted testimony (which is completely consistent with the recorded transcriptions) affirmatively reveals an absence of any such intent. The theory advanced to justify a conviction proceeds on the proposition that reliance must be placed on the testimony of Gmerek (an admitted extorter), as to Bauer's expressions of influence but that no reliance or substance is to be accorded to Gmerek's testimony regarding Bauer's offers of a money back guarantee. While Bauer's announced intent to attempt to bribe public officials is not to be condoned, such cannot be transformed into an intent to steal from Gmerek.

Relevant to the vital inquiry regarding the actions and intent of the participants, it should be noted that the jury, following this lengthy trial and deliberations of over four hours, had returned for instructions and rereading of testimony on several occasions. One request with which there was no compliance, despite the presence of the court stenographer at (and presumably before) the time the jury returned with verdicts, was to have read back certain of Gmerek's testimony. Defendant quite properly raises this claim of prejudicial error and argues that the jury was entitled to have the Trial Judge comply with the mandate of section 427 of the Code of Criminal Procedure and cites *People* v. *Gonzalez* (293 N. Y. 259) and *People* v. *Lorenz* (16 A D 2d 135). This is especially true in light of the jury's obvious confusion and their desire to search the evidence for the requisite elements of the charged crimes. The requested testimony was relevant to defendant's statements and actions, some of which the majority leans upon for affirmance of the second count. Furthermore, the majority has indulged in the unwarranted assumption that the information sought by the jury concerned only the alleged conspiracy. The fact is that the jury asked "to have the Court Stenographer read back the testimony of Gmerek on the original meeting ". The majority has relied heavily on Gmerek's testimony of this meeting in order to establish the basis for the false statements attributed to Bauer *and which*, as they say, forms a basis and foundation

for the affirmance of the conviction of attempted grand larceny. Here, as in *People* v. *Westerman* (7 A D 2d 943) where the conviction was reversed for a failure to give information requested by the jury, the information sought pertained to a vital point. What was Bauer's intent? Both *People* v. *Gezzo* (307 N. Y. 385, 396) and *People* v. *Gonzalez* (293 N. Y. 259, 263, *supra*) stand for the unassailable proposition that under section 427 of the Code of Criminal Procedure "the court *must* give the information requested, and where the court fails to give information requested upon a vital point no appellate court may disregard the error under section 542 of the Code of Criminal Procedure ". The language of the court in *Westerman* (7 A D 2d 943, 944, *supra*) is most appropriate: " If the testimony had been read, the jury might well have found defendant guilty but it may also be argued that after having heard the testimony, the jury might have acquitted the defendant. The court made no inquiry as to the reason for the request, but it is a fair assumption there must have been some disagreement or other justifiable reason for it. Under the section (427) it was mandatory on the part of the court to acquiesce in the request of the jury and failure to do so constitutes reversible error."

Considerable reliance has been placed on *People* v. *Gardner* (144 N. Y. 119) and *People* v. *Moran* (123 N. Y. 254) in order to sustain this conviction. They are readily distinguishable since in neither of these cases was there any doubt at all as to defendant's intent to (1) pick an [empty] pocket as in *Moran* and (2) to extort money [from one not in fear] as in *Gardner.*

Bauer's mental processes must be deduced from and are revealed by Gmerek's testimony and the transcripts of certain conversations. The only conclusion which flows from the offers made by defendant is that he had no intention of cheating Gmerek and further if he did not produce results, the money would be returned.

Additionally, it is unquestioned that subsequent to the first meeting of these men, Bauer had telephoned the District Attorney and, while he did not on this occasion discuss the Gmerek case, it is evident from his quoted remarks that he intended to do so in order to carry out his previously announced intention to offer a bribe.

To establish defendant's guilt beyond a reasonable doubt it was of first importance to prove his intent to steal (*People* v. *Powell,* 22 A D 2d 959), a finding that must here rest upon an unsupported inference, and an essential element which is entirely lacking. Moreover, it is axiomatic that legal proof of an *intent to steal* in this case must rest upon circumstances.

As such it can of necessity be shown only by circumstantial evidence. In determining the force, vitality and validity thereof we must, therefore, be governed by the long-established rules of this type of evidence. In this regard, no escape can be had from the quoted testimony in these opinions and its effect on the well-settled rule that not only must *all* the circumstances be consistent with and point to the accused's guilt, "but they must be inconsistent with his innocence" (*People* v. *Fitzgerald*, 156 N. Y. 253). Do these "circumstances" exclude to a moral certainty every other hypothesis except that of the accused's guilt? The answer clearly is, no. (See *People* v. *Weiss*, 290 N. Y. 160; *People* v. *Woltering*, 275 N. Y. 51.) By Gmerek's testimony as to his conversation with Bauer, the prosecution has provided adequate and persuasive evidence that Bauer lacked the requisite criminal intent to steal. Bauer's offers of a receipt, a promissory note and a money back guarantee of success put the lie to any larcenous design. Furthermore, to reconcile his offers to Gmerek of *written assurances* of satisfactory results, with the prosecution's theory that Bauer intended to steal the $2,000, necessitates not only a resort to an inference based upon an inference, but actually a stretching of the imagination. "In this case where the prosecution, of necessity, resorted to circumstantial evidence to establish defendant's guilt, there was imposed upon the People an unusual burden which required not only the elimination of 'reasonable doubt whether his guilt is satisfactorily shown' (Code Crim. Proc. § 389) but also the elimination of uncertainty as to those asserted facts from which inferences of defendant's guilt were drawn. Close scrutiny of this record reveals however that in the vital phases of the proof uncertainty abounds where certainty is required. The instances to which we have referred, and others not mentioned, leave us unconvinced that the evidence upon which the judgment of conviction rests satisfies the test for circumstantial evidence" (*People* v. *Taddio*, 292 N. Y. 488, 497).

We cannot shirk our obligation to uphold this time-tested rule of law simply because the jury may have found defendant had a wicked motive regarding his announced intent to interfere with the duties of public officials. This defendant is as much entitled to the benefit of a rule of law as the most blameless member of society. To disregard the rule in this case and thus avoid the well-established requirements of circumstantial evidence would but lead to erosion of the rule and endanger the rights of all. (*People* v. *Mirenda*, 23 N Y 2d 439; *People* v. *Donovan*, 13 N Y 2d 148, 154 [and cases therein cited].)

In order to determine the existence of an intent to steal, the jury was required to resort to pure conjecture and speculation. In so doing "conjecture has filled the gaps left open by the evidence, and the presumption of innocence has yielded to the presumption of guilt" (*People* v. *Galbo,* 218 N. Y. 283, 294). In this connection and in an assessment of the state of the evidence we are mindful of the statement in *People* v. *Leyra* (1 N Y 2d 199, 210–211) wherein the court stated "as we wrote in *People* v. *Woltering, supra* (275 N. Y. 51, 61), ' by indulging in the same inferences that the jury has been permitted to draw, the court may feel defendant is guilty', but such a feeling is a far cry from proof of guilt. To allow the conviction to stand, therefore, ' would violate principles which have stood the test of time and permit convictions where proof of guilt, in the accepted sense is, lacking'. (*People* v. *Woltering, supra,* 275 N. Y., at p. 61.) "

We are required by statute to grant a new trial when, as here, we are "satisfied that the verdict * * * was against the weight of the evidence or against the law, or that justice requires a new trial, whether any exception shall have been taken or not, in the court below." (Code Crim. Pro., § 527; *People* v. *Cashin,* 259 N. Y. 434; *People* v. *Guidarelli,* 22 A D 2d 336; *People* v. *Lewis,* 13 A D 2d 714; *People* v. *Hull,* 12 A D 2d 815; *People* v. *Savage,* 5 A D 2d 846.) All three of these conditions abound in this case for the several reasons indicated.

The conviction on the second count should be reversed, on the law and the facts, and a new trial granted.

WITMER, BASTOW and HENRY, JJ., concur with DEL VECCHIO, J. P.; GABRIELLI, J., concurs with the majority as to the reversal and dismissal of the first count, and votes to reverse the conviction of defendant Bauer on the second count (attempted grand larceny, first degree), and grant a new trial on that count of the indictment, in an opinion.

Judgment of conviction (in first above-entitled action) for conspiracy reversed, on the law and facts, and first count of indictment dismissed; judgment of conviction for attempted grand larceny, first degree, affirmed.

Judgment of conviction (in second above-entitled action) unanimously reversed on the law and facts, and indictment dismissed.