THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DONALD JONES, Appellant.

Second Department, May 26, 1981

APPEARANCES OF COUNSEL

*Joel S. Ezra* for appellant, and appellant *pro se.*

*Eugene Gold, District Attorney (A. David Stern* of counsel), for respondent.

## OPINION OF THE COURT

GULOTTA, J.

This appeal requires us to consider whether a claim based upon an alleged lack of probable cause to arrest an individual is available on appeal as a ground for the suppression of statements held to be voluntary and admissible by the hearing court. We hold that the issue of probable cause, raised tentatively but never pursued at a suppression hearing devoted almost entirely to Fifth Amendment concerns, has not been preserved for appellate review. Finding no defect in the plea, we affirm.

I

Appellant pleaded guilty to murder in the second degree (felony murder) in satisfaction of a multicount indictment charging him and his two codefendants, Terrence Mc-Michaels and David Green, with the crimes of murder, attempted murder, assault, robbery and criminal possession of a weapon.[1] The charges stem from the armed robbery of a subway token booth clerk in Brooklyn on November 9, 1977, during which one Transit Authority worker was killed and another seriously injured.[2] During his plea

---

1. Codefendant McMichaels pleaded guilty to murder in the second degree following the denial of his pretrial suppression motion, which was heard jointly with appellant's motion; his appeal is decided herewith *(People v McMichaels,* 81 AD2d 925). Codefendant Green also pleaded guilty to murder in the second degree. All three defendants were ultimately sentenced to indeterminate terms of imprisonment of 15 years to life.

2. The indictment (No. 3864/1977) alleged that on or about November 9, 1977, appellant, acting in concert with his codefendants, forcibly stole a quantity of subway tokens and transfer passes from one Raymond Curiale and that, in furtherance of that crime or in the course of immediate flight therefrom, they intentionally shot and killed one Calvin James Butler by shooting him with a loaded firearm which they knowingly and intentionally possessed for that purpose, and that they also shot and seriously injured Raymond Curiale. The plea allocutions of both appellant and McMichaels reflect the fact that one individual was fatally shot during the course of the robbery, but make no reference to the other, nonfatal shooting.

allocution, appellant admitted that both he and McMichaels had gone to codefendant Green's house on the morning in question and that he knew that Green was armed.[3] Later that morning, appellant and his codefendants went to the subway station at Van Siclen and Pitkin Avenues, in Brooklyn, knowing that "we were going to rob something", and when they got there, they decided to rob the token booth clerk. Following the robbery, appellant learned for the first time that Green had shot a man while he and McMichaels were fleeing the scene. Appellant nevertheless took his share of the stolen money, approximately $16.

Around 7:30 that evening, acting on information provided by a confidential informant, a team of six plainclothes police officers observed appellant and McMichaels coming out of Green's house, and followed them to the corner of Pennsylvania and Livonia Avenues. At that point, the team of officers approached the pair, identified themselves as policemen, and held them at gunpoint. Transit Police Detective Edward Alexander thereupon asked the two suspects whether "their names were Donald and Terrence", and each replied with his own name. Upon being informed by Alexander that the officers were investigating a robbery at a token booth which had occurred earlier that day, appellant admitted, according to Alexander, that he was "there", but that he "didn't do any shooting."[4] The pair was then placed in a patrol car and driven to a location on Bradford Street near Livonia Avenue, where they were identified by members of David Green's family. They were then transported to the 75th Precinct where, after being advised of their constitutional rights, each defendant was interrogated by Detective Louis Rango and, later, after renewed *Miranda* warnings, by Assistant District Attorney Edward McNew. These interrogations produced inculpatory statements in which each of the two defendants admitted his complicity in the fatal robbery.

Prior to entering their respective guilty pleas, both

---

3. In pleading guilty, McMichaels admitted having given a loaded pistol to Green at the latter's house on the morning of November 9, 1977, the date of the robbery.

4. McMichaels made no verbal response to Detective Alexander's statement.

appellant and McMichaels moved to test the admissibility of their inculpatory statements, and a joint *Huntley* hearing was held before Justice MIRABILE. Appellant sought at that time to suppress his admissions on the ground that they were "unlawfully extracted * * * through fear, duress and coercion by law enforcement officers" in violation of his constitutional rights under the Fifth Amendment, but no violation of any of his Fourth Amendment rights was alleged in the moving papers. At the hearing, appellant professed that the police officers did not take him and McMichaels directly to the precinct house after their arrest, but rather that they drove them around for about 30 minutes "trying to make us * * * confess", without ever advising them of their constitutional rights. During this interval, according to appellant, one of the officers pointed a gun at him and threatened to "blow * * * [his] brains out" if he refused to tell the officer "what happened". Appellant further maintained that, prior to his interrogation at the police station, four officers had threatened him with guns and insisted that " 'when the D.A. get [*sic*] here' ", appellant and McMichaels " '[had better] tell him [the District Attorney] whatever this other officer [meaning Detective Rango] is going to come in here and tell you to tell him.' "[5] Appellant also gave testimony that he had been smoking marihuana combined with "angel dust" and drinking alcoholic beverages on the morning of November 9, 1977, which was counterbalanced by Detective Rango's testimony that appellant was not "high" on angel dust at the time that he was questioned. Thus, the essence of appellant's position at the *Huntley* hearing was that his station house confessions

5. On cross-examination by the People, appellant testified for the first time that four police officers in plainclothes, whom he described with some particularity, took him into a small room at the station house, and subjected him to continual beatings over the course of "[a]bout a half-hour" in an attempt to coerce admissions from him. Appellant testified that he was "hurt" and "kind of sore" after the incident, but that he was not bleeding. The prosecutor then brought out the fact that appellant had neither sought nor received medical treatment either on the evening of his arrest (and interrogation) or the following day, during which time he was held temporarily at central booking, arraigned in the Criminal Court and then taken to Rikers Island, which he knew contained a hospital facility. Appellant accounted for his failure to seek medical help by explaining that he was "afraid to ask" and that, "[e]ven if I would have asked of [*sic*] them, I assume they would have said no."

had not been the product of any voluntary waiver of his Fifth Amendment rights.[6]

Although appellant made no attempt during the presentation of his case at the suppression hearing to contest the existence of probable cause for his arrest, the issue *was* broached during the People's case when appellant cross-examined Detective Alexander concerning the inculpatory statement allegedly made by the former during their initial encounter. On direct examination, Alexander testified to the circumstances surrounding the arrest, but was not questioned with regard to the source or accuracy of the information which prompted the officers to approach appellant and McMichaels on the corner of Livonia and Pennsylvania Avenues. On cross-examination, however, appellant's attorney, George Farkas, provoked an objection by the People when he asked the detective about the nature of the information which had led the police to arrest appellant and McMichaels, and the following colloquy ensued:

"MR. FARKAS: If your Honor please, the stop of these defendants on a public street is certainly relevant to the suppression. If they were stopped for no reason, whatsoever, then it is suppressive [*sic*].

"THE COURT: What does that have to do with the Huntley hearing?

"MR. FARKAS: If the statement is made because the defendants are stopped on a public place by police officers for no reason whatsoever, any fruits of that stop or that search is suppressible. And if he stopped them because they didn't like the way their faces looked, it is suppressible. And if they have reason to stop them, then it is relevant.

"THE COURT: [Objection o]verruled."

Alexander proceeded to testify that the information implicating appellant and McMichaels had been supplied by an "informant" whose identity was known to Alexander

---

6. Appellant conceded at Criminal Term that neither Rango nor Assistant District Attorney McNew had threatened him in any way. Moreover, he did not question either the fact or the sufficiency of the *Miranda* warnings as administered to him by each of these individuals.

and with whom he had worked on "previous occasions".[7] The detective then indicated that both he and his partner had spoken personally with the informant, who had informed them that while he (the informant) had not been an eyewitness to the crime, he had heard "from some other sources" that appellant, McMichaels and Green "were involved" in the robbery and could be found at Green's house. Alexander further indicated that it was "solely on the basis of" the informant's confidences that appellant and McMichaels were stopped on the evening of November 9, 1977, and that the police had intended to take the codefendants into custody from the outset. At this point, the prosecutor conceded that "the defendants were being apprehended at that time."

Appellant thereupon terminated his cross-examination of Detective Alexander, subject only to his request to inspect the witness' notes and other police reports relating to the arrest. However, after a brief discussion concerning the documents to be produced, the prosecutor announced to the court that "the People do not intend to introduce the statement that Mr. Jones made to this detective [Alexander]", and that "based on that [declaration of intent], Mr. Farkas has told me that the detective does not have to come back this afternoon with his memo book." The agreement was sealed in the following colloquy:

"MR. FARKAS: Yes, your Honor. If the representation is that the statement will not be introduced in evidence, then the testimony of the officer is basically useless to the trial, and I have no other questions of him.

"THE COURT: You mean the statement by Mr. Jones to this witness?

"MR. FARKAS: Allegedly made to this witness. I would submit that it is unconstitutional in its nature, but if Mr. Murphy [Assistant District Attorney] is willing to concede that he wouldn't use it, then I don't need this witness.

"MR. MURPHY: I don't intend to have the witness testify

---

7. The court sustained the People's objection to appellant's question as to whether the informant was "available". At this time, appellant's counsel stated that he was not requesting that the informant be produced or that his identity be revealed.

to that statement during the trial, unless the defense opens up the door. But based on what we heard so far, it is not something that I intend to use.

"THE COURT: Come up here a moment, both of you.

"(Discussion at side bar, off the record)

"MR. FARKAS: Just so that we are clear, your Honor, I believe that the representation of the District Attorney is that he will not introduce that statement attributed to Donald Jones either through Detective Alexander or anybody else that was there at that time. That statement is out.

"MR. MURPHY: Correct, your Honor, unless two things happen: either the defense opens the door or the defendant himself testifies and denies making that statement.

"MR. FARKAS: I know about People v. Harris.

"THE COURT: Then, in other words you will not use that.

"MR. MURPHY: On my case I do not intend to use that statement.

"Based on that, then Detective Alexander can leave. He does not have to bring back his memo book.

"THE COURT: He can.

"MR. FARKAS: He can go back from whence he came."

During the remainder of the hearing, neither appellant nor his codefendant made any further inquiry into the sufficiency of the information supplied by the confidential informant to establish probable cause, and the People made no attempt to supplement the testimony of Detective Alexander on that issue. Moreover, no reference was made to these matters either in the motions to suppress at the close of the hearing, or in the arguments of counsel during summation. Finally, the hearing court did not consider the question of probable cause in either its oral or written decision, but denied appellant's motion to suppress his precinct house admissions on the ground that the credible evidence established that he "voluntarily, knowingly and intelligently waived [his] Constitutional rights." Following Justice MIRABILE's ruling, appellant withdrew his previously entered plea of not guilty and, under circumstances which merit discussion later in this opinion, entered a plea of guilty to felony murder.

On appeal, appellant asks us to vacate his plea on the ground that the information provided by the confidential informant was insufficient to establish "probable cause", and that his statements made at the precinct house should have been suppressed as the tainted fruit of an illegal arrest.[8] The People counter that the Fourth Amendment claim has not been preserved for appellate review and, in the alternative, that the arrest was constitutional in that the informant's tip provided a "reasonable suspicion" which justified the initial stop and later ripened into probable cause when appellant made his inculpatory statement to Detective Alexander. For the reasons which follow, we agree with the People that the issue of probable cause has not been preserved for our review. Accordingly, we express no opinion on the merits of appellant's Fourth Amendment claim.

## II

The doctrine of preservation of error is a natural and familiar outgrowth of our adversarial system of justice. Concisely stated, it requires the parties to an adversary proceeding to press their claims at a procedural stage and in a manner by which they may be efficaciously determined, or otherwise forfeit their right to be heard on the issue. Often couched in terms of "waiver", which denotes the intentional relinquishment of a known right, the doctrine is perhaps more properly conceived as a method of "procedural default", whereby the failure to raise a timely claim of error—whether the omission be intentional or inadvertent—consigns the objection to permanent repose "by operation of the state law of judgments" (Wangerin, "Plain Error" and "Fundamental Fairness": Toward a Definition of Exceptions to the Rules of Procedural Default, 29 DePaul L Rev 753, 757-758). Regardless of its precise formulation, however, the preservation requirement is but another judicial device which, like the many species of "former adjudication", enhances the salutary objective that litigation not be unduly protracted, but proceed expeditiously to

---

8. Appellant does not contest, on appeal, the hearing court's conclusion that he voluntarily waived his constitutional rights at the police station, or that the statements which he made thereafter were not coerced.

a close. In the context of an appeal, which, of course, is not intended as a duplication of trial-level proceedings, the rule operates to assure that the record will be adequate to the task of review, and that the principles of "fair play" will be observed at the trial level by affording opposing parties a timely opportunity to counter any claim of error with argument or evidence. To allow otherwise, as Chief Judge CULLEN recognized more than 70 years ago, might well encourage gratuitous bids for reversal on appeal, placing unnecessary burdens upon the administration of justice: "The most learned and careful judge will at times during the trial of an action fall into an error which he would at once correct if his attention were called thereto. The purpose of an objection and exception is to call the attention of the judge to the ruling complained of, that he may correct the error if such it is. To permit the party to remain silent and suffer the error to go unchallenged and claim on an appeal from an adverse judgment the benefit of the error, as if objection and exception had been taken, would not conduce to the proper administration of justice nor tend to secure a fair trial for the defendant, but simply give him an opportunity to reverse on appeal a proper judgment." *(People v Jackson,* 196 NY 357, 362-363.)

It has also been cogently argued that the doctrine of preservation serves to strengthen a criminal defendant's right to a fair trial, and that "[a]bandonment of the rule actually increases [the prospect of] trial error. Absent the finality rule, judges, prosecutors, and defense counsel need not carefully watch for errors during trials because errors can be corrected on appeal even though not preserved for review" (29 DePaul L Rev 753, 760). Finally, adherence to the rule has been said to enhance public confidence in the administration of criminal justice by dispelling "a perception of endless litigation" and facilitating the swift and certain imposition of punishment upon persons justly convicted of having committed a crime (29 DePaul L Rev 759-760; see, also, *People v Michael,* 48 NY2d 1, 6).

Firmly implanted in our legal tradition, the preservation doctrine as it applies today in criminal cases is embodied in CPL 470.05, which provides, in pertinent part: "2. For purposes of appeal, a question of law with respect

to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an 'exception' but is sufficient if the party made his position with respect to the ruling or instruction known to the court. In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered." (Cf. CPL 710.70, subd 2.) Moreover, it is important to note that the mere fact that an alleged assignment of error may implicate or concern the venerated provisions of the Federal Bill of Rights does not alone render it immune from the need and requirement of proper preservation. Thus, while our courts have deemed a certain coterie of constitutional rights so fundamental that they may be raised in the first instance .at any time and at any level of the proceedings either because they are bound up so intimately with the defendant's right to a fair trial (e.g., *People v Banks*, 53 NY2d 819; *People v Carmine A.*, 53 NY2d 816; *People v Ermo*, 47 NY2d 863; *People v Arthur*, 22 NY2d 325 [right to counsel]; *People v Patterson*, 39 NY2d 288, affd 432 US 197 [burden of proof]; but see *People v Thomas*, 50 NY2d 467) or because the right involved is one, such as the prohibition against double jeopardy, which strikes at the very heart of the State's power to conduct a trial *(People v Michael*, 48 NY2d 1, *supra)*, constitutional issues such as the one which appellant seeks to raise have not been granted entry into that elite class and are subject to forfeiture under the doctrine of preservation (e.g., *People v Patterson*, 53 NY2d 829 [unreasonable seizure of the defendant's person]; *People v Tutt*, 38 NY2d 1011; *People v Booker*, 49 NY2d 989 [*Miranda* warnings]; *People v Martin*, 50 NY2d 1029 [warrantless entry]; see, also, *People v Lieberman*, 47 NY2d 931 [speedy trial]).

For present purposes, CPL 470.05 (subd 2) may be further divided into two distinct parts, each with its own separate emphasis. The first two sentences are addressed to the situation in which a ruling or instruction has affirmatively been made by the court at nisi prius, and the issue affecting appealability is whether a timely and sufficient protest has been registered thereto (see, e.g., *People v Cona*, 49 NY2d 26, 33). By way of contrast, the final sentence of CPL 470.05 (subd 2) applies to a "party who without success has either expressly or impliedly sought or requested a particular ruling or instruction", and addresses the preservation issue where the court has remained unmoved by the application and rendered an "ultimate disposition" which is at variance with the request. The instant case · involves both of these aspects, but clearly it is the second which is the more significant. Accordingly, when, at the suppression hearing, the court explicitly overruled the People's objection to the line of questioning directed at the nature of the information relied upon by the police in effecting the arrest, appellant (having prevailed on that issue) was hardly in a position to complain. It was only later during the hearing—when the prosecutor declared his intention *not* to offer appellant's admission to Detective Alexander into evidence and both sides agreed that the further examination of the detective would be unnecessary —that the now pertinent question arose, i.e., whether appellant's earlier foray into the question of probable cause survived that agreement. Thus, in terms of CPL 470.05, our present inquiry must be whether, in the absence of any "actual protest" by appellant to the hearing court's failure to rule on the issue of probable cause (or its implicitly adverse ruling), appellant may be deemed to have "either expressly or impliedly sought or requested" a ruling on that issue sufficient to preserve the question for appellate review. It is to this question which we now turn, beginning with a consideration of *People v Tutt* (38 NY2d 1011, *supra)* and *People v Martin* (50 NY2d 1029, *supra)*.

### III

The focus of the doctrine of "preservation" as set forth in the majority opinions in both *People v Tutt (supra)* and

*People v Martin (supra)* emerges as a scrupulous insistence upon the People's "evidentiary opportunity to counter" the defendant's assertions *(Tutt, supra,* p 1013), a concept which translates, *inter alia,* into an exacting scrutiny of the degree to which the People have had a "fair opportunity to present their proof" on the issues advanced by the defendant on the appeal *(Martin, supra,* p 1031). A primary consideration, as noted in *Martin (supra,* p 1031), is the desirability of avoiding or promptly curing "errors of law which might otherwise necessitate a retrial" (citing *People v Michael,* 48 NY2d 1, 6, *supra),* an interest which manifests itself in cases such as the present in the desirability of averting the vacatur of otherwise binding pleas of guilt. Instructively, the approach used to effectuate these principles hinges upon a rather exacting assessment of the issues which have been raised at the suppression hearing in order to determine whether a given issue has been preserved for appellate review.

In *People v Tutt (supra),* for example, the defendant's position at the suppression hearing was that the police had failed to administer the *Miranda* warnings to him before subjecting him to interrogation, a contention which was totally rejected by the motion court. On appeal following a plea of guilty, however, the defendant argued (in an apparent shift of positions) that the warnings which *had* been administered to him were constitutionally defective in the manner in which they informed him of his right to an attorney, and that the foregoing required the suppression of the contested testimonial and physical evidence (38 NY2d, at p 1012). In a 4 to 3 decision, the Court of Appeals held that the latter contention had not been preserved for appellate review, stating (p 1013) that "[w]here [as here] * * * the defendant fails at the suppression hearing to challenge a narrow aspect of the sufficiency of the admonitions given him, at a time when the People would have an evidentiary opportunity to counter his assertion, he may not then be heard to complain on appeal."

Somewhat similarly, in *People v Martin* (50 NY2d 1029, *supra),* the defendant, who had pleaded guilty to criminal possession of a weapon in the third degree, sought to argue

on the appeal that the police had violated the constitutional rule announced in *Payton v New York* (445 US 573), when they entered his home to arrest him without obtaining a warrant. At the suppression hearing, however, defendant never contested the legality of the officers' entry or requested the motion court to rule upon the propriety of their presence in his home, but argued instead "that the physical evidence seized in conjunction with his arrest should be excluded because it was found by the arresting officers as a result of an unauthorized 'general search' and not, as the People contended, through an inadvertent discovery of items lying 'in plain view' " (50 NY2d, at p 1030). Invoking *Tutt* (38 NY2d 1011, *supra*) and other cases, four members of the five-Judge majority[9] held that the only question placed in issue before the hearing court "was the fundamentally factual question [of] whether the testimony of the police officers concerning their observations upon entering was credible under the circumstances", and concluded that the constitutional challenge to the warrantless entry had not been timely raised *(People v Martin*, 50 NY2d, at p 1031). The majority opined (p 1031) : "Having thus failed to raise a constitutional challenge to the police officers' entry into his home within the context of his initial suppression motion, defendant is now foreclosed by our rule of 'preservation' from advancing any such ground for reversal on appeal to this court * * * [D]efendant was required to raise his constitutional challenge to the arrest before the suppression court if he intended to base his appeal from its decision upon that ground. Since he failed to do so and thereby failed to give the suppression court an opportunity to consider the question before the proceeding against him progressed any further, defendant cannot now rely upon the constitutional issue as a ground for reversal in this court."

The holdings in *Tutt* and *Martin* were not, of course,

---

9. Judge MEYER concurred in the result in *People v Martin (supra)* on the basis of the last paragraph of the majority memorandum (see 50 NY2d, at pp 1031-1032), which held that the factual issue regarding the " 'inadvertence' " of the police officers' discovery of the challenged evidence " 'in plain view' ", which issue had been resolved against the defendant at Criminal Term and affirmed on appeal, was not reviewable in the Court of Appeals *(supra,* p 1035).

unanimous. In *People v Tutt (supra)*, for example, the dissenters, in an opinion by Judge (now Chief Judge) COOKE, argued (p 1017) that the sufficiency of the right-to-counsel warning had been placed in issue when defendant's attorney moved at the close of the suppression hearing to suppress the evidence " 'on the grounds there was no *proper* warning, [as] required by the constitution and the doctrine of *Miranda v. Arizona* [384 US 436]' (emphasis supplied)." Moreover, Judge COOKE continued, after defense counsel had argued in support of the motion, the People were given an ample opportunity to be heard, and although the District Attorney "spoke at some length", he "did not request an opportunity to submit [any] additional proof" *(People v Tutt*, 38 NY2d, at p 1017). On the strength of these facts, the dissent concluded (p 1017) that "[n]o further formalism should have been required of defendant's attorney in order that the right to review the error be preserved (cf. *People v Drislane*, 8 NY2d 67, 70)". Notably, it does not appear from the respective opinions in *Tutt* whether either counsel during his argument of the motion directly addressed the question of the sufficiency of the warning regarding the right to an attorney, and it would be speculative, in our view, to read the holding of that case as mandating a finding of nonpreservation in the face of an *actual* joinder of issue at the hearing. It is not unfair to observe, however, that whatever the precise state of affairs in *Tutt*, it is unlikely that a fleeting reference to "no proper warning" in defense counsel's motion should have alerted the prosecution to the need to address the sufficiency of the right-to-counsel admonition in particular, at least in the absence of other circumstances which might have focused attention upon that narrow aspect of the case. Taking a somewhat different approach, the dissenters in *People v Martin* (50 NY2d 1029, 1034, *supra)* were "unable to perceive the possibility of any change in the People's proof by virtue of a challenge to the arrest" and, citing *People v Tutt (supra)*, concluded on that basis that "[t]he manner in which the parties and the courts below [had] addressed the suppression motion is sufficient to warrant consideration [of the *Payton* issue] by [the] court."

The dissenting opinions in both *Tutt* and *Martin (supra)*

can thus be seen to exemplify a more generous approach to the doctrine of preservation of error which, whatever its merits in a particular case, does not appear to represent the mainstream of reported cases. Rather, the majority of our courts appear to require a timely objection or some other affirmative conduct which is sufficiently specific to focus attention upon the particular issue sought to be raised on appeal.

In *People v Lubow* (29 NY2d 58, 68), for example, the Court of Appeals refused to consider, *inter alia*, a defendant's claim that there had been no proper "allocation" of the voices on a particular tape recording which had been admitted into evidence, where the *sole* objection to the admission of that recording at trial was that " 'it interfered with [the defendant's] constitutional rights, and that it [was] cumulative'." Similarly, the Appellate Division, Fourth Department, in *People v Dudley* (29 AD2d 232, 235-236, affd on other grounds 24 NY2d 410), declined to reverse a conviction on the "technical" ground that defendant's confession had been witnessed by a "judicial officer" rather than a notary public (cf. *People v Foley*, 8 NY2d 153; *People v Oakley*, 9 NY2d 656; *People v Warner*, 9 NY2d 670), where the foregoing had not been urged on appeal and where the only ground upon which the defendant had objected to admission of his confession at trial was that it had been coerced in violation of his constitutional rights (but see dissenting opinion of GOLDMAN, J., pp 236-240). In fact, even where the state of the law affecting the issue sought to be raised on appeal was unclear at the time of trial, the Court of Appeals has not hesitated to require some degree of specificity in the trial-level proceedings. Thus, following the landmark decision in *Mapp v Ohio* (367 US 643), the court held, in effect, that the doctrine of preservation applied, in principle, to pre-*Mapp* prosecutions and that a constitutional search and seizure issue could not be raised in the first instance upon the appeal (see *People v Friola*, 11 NY2d 157; *People v Muller*, 11 NY2d 154; *People v Loria*, 10 NY2d 368). Owing to the nature of the pre-*Mapp* decisional law, the court, however, did not require a specific objection based squarely on Fourth Amendment principles to preserve the issue for appellate review

(see *People v O'Neill*, 11 NY2d 148, 152), but it *did* require that there be some form of inquiry at nisi prius into the legality of the search or seizure or the admissibility of the resulting evidence, "or at least some effort in that direction" *(People v Friola, supra,* p 159; see *People v O'Neill, supra; People v Yarmosh*, 11 NY2d 397; *People v Wade*, 12 NY2d 61; cf. *People v Coffey*, 11 NY2d 142). Where, on the other hand, defense counsel not only failed to object to the admissibility of the evidence, but expressly stated that he had no objection to its reception, the Fourth Amendment question was deemed to have been waived (see *People v Friola, supra,* p 159).

A defendant, of course, need not expressly "waive" his objection to a particular matter to be foreclosed from raising the issue on any ensuing appeal, as the mere failure to register a timely protest can result in the forfeiture of the right to appellate review. In *People v Lubow* (29 NY2d 58, *supra),* for example, the information charging the defendant with criminal solicitation failed to specify whether he was being charged with a violation or a misdemeanor (see Penal Law, §§ 100.00, 100.05), and the defendant neither sought clarification of the charges nor voiced an objection when the trial court proceeded to try him under the misdemeanor section. Under these circumstances, the Court of Appeals held that the matter had not been preserved for appellate review (29 NY2d, at pp 67-68). In *People v Di Stefano* (38 NY2d 640, 646-647), the court again declined to review an issue (the timeliness of an application to amend an eavesdropping warrant) where the matter had not been litigated below and where "it [did] not appear that the court's attention was directed to that subject", while in *People v Bauer* (32 AD2d 463, affd 26 NY2d 915), the Fourth Department refused to overturn a guilty verdict where the jury, at first, requested a rereading of certain portions of the trial testimony, but then, while waiting until the court stenographer could be located, resumed their deliberations and proceeded to render a verdict without it. In declining to review the propriety of this procedure, the Appellate Division observed (p 475): "[D]efense counsel made no objection to the recording of the verdict as the jury was then ready to announce it,

and to the discharging of the jury, and made no mention of the fact that the requested testimony had not been reread. It seems that by failing to raise the issue at this point, when it might well have been obviated, [the] defendant has waived the right to have it reviewed on [the] appeal." However, the court then went on to note that the error, at its worst, was a technical one in view of the fact that the testimony in question related to a particular count of the indictment which had already been dismissed, and, further, that it was fair to assume that had the jury been timely polled, its members would have agreed that the testimony was no longer considered necessary to their deliberations *(People v Bauer, supra,* pp 474-475).

The rather obvious failure to register a timely protest as typified in the preceding case must be contrasted with those cases in which the defendant has fairly apprised the court and District Attorney of the issue to be urged on appeal, albeit with a different emphasis or on a different theory than that which is ultimately found to be dispositive. In this regard, *People v De Bour* (40 NY2d 210) is instructive.

In *People v De Bour (supra)*, a threshold (and, largely, overlooked) question was whether the legality of the officers' initial encounter and questioning of the defendant had been adequately preserved for appellate review. There, the argument of the suppression motion had apparently centered upon the alleged impropriety of the officers' conduct *after* the defendant had already been stopped. In ruling that the legality of the initial encounter had been adequately preserved, the court opined (pp 214-215): "[W]hen [as here] the defendant moves to suppress evidence and specifically challenges the authority of the police to accost [him] * * * as well as the subsequent search we believe that the issue has been preserved. Nor is review of this case barred by the holding in *People v Tutt* (38 NY2d 1011) where we held that an issue will not be preserved if the defendant fails to raise it at a time when the People would have an evidentiary opportunity to counter his assertion. In contrast, here the defendant's suppression papers asserted, *inter alia*, that the initial restraint by the police was effected without consent, warrant, court order, or other

lawful authorization. Neither can it be said that defense counsel did not pursue this point in view of the effort on cross-examination of the prosecution's only witness, Officer Steck, to ascertain the precise reason he and his partner decided to approach the defendant. *The mere emphasis of one prong of attack over another or a shift in theory on appeal, will not constitute a failure to preserve* (see, e.g., *People v Arthur*, 22 NY2d 325, 329; *Dewey v Des Moines*, 173 US 193, 198)." (Emphasis supplied.) *De Bour's* reliance upon a "shifting-theory" or "differing-prong-of-attack" rationale to preserve an issue for appellate review must, however, be read in context.

In *People v De Bour (supra)* the members of the court, including the dissent, were of the unanimous opinion that the record at the suppression hearing was sufficiently developed to permit an adequate consideration of the substantive issues raised on the appeal. Of course, the dissenters in *People v Martin* (50 NY2d 1029, *supra*) were of a similar view, but the majority in that case did not agree. Moreover, unlike *People v Martin (supra)*, the motion papers in *De Bour* actually broached the issue ultimately challenged on the appeal (i.e., the legality of the defendant's detention), and the issue was apparently a subject of inquiry before the suppression court. Furthermore, unlike the situation in *People v Tutt* (38 NY2d 1011, *supra*), where the defendant initially questioned the existence *but not the sufficiency* of the *Miranda* warnings, the moving papers in *De Bour* were deemed to have been sufficiently well focused to call attention to the legality of the police intrusion ultimately analyzed by the court. Thus, while a mere shift in emphasis on the appeal may not bar review where the record with regard to that issue has been adequately developed, a different result may ensue where appellate evaluation of the newly-urged predicate for relief is stymied by the lack of an adequate transcript (but see *People v O'Neill*, 11 NY2d 148, *supra*). Similarly, although the record in a given case might allow an appellate court to venture an opinion with regard to a given issue, the lesson of *Tutt* (38 NY2d 1011, *supra*) and *Martin (supra)* appears to be that the courts will refrain from doing so where the defendant has failed, whether by design or in-

advertence, to pursue the procedures which might have insured a deliberate and specifically focused adversarial treatment of the issue in the first instance.

Instructively, the principle of equal adversarial opportunity as emphasized in *Tutt* and *Martin* has been observed in other recent decisions. Thus, in *People v Moore* (42 NY2d 421, 435, cert den 434 US 987), a defendant's contention that the prosecutor had improperly used his notice of alibi for impeachment purposes at trial fell upon deaf ears in the Court of Appeals where the defendant had limited his trial objection to the ground that the prosecutor was falsely stating the contents of the notice, and in *People v Johnson* (42 NY2d 841, 842), the court again declined to reach an issue (i.e., the propriety of police conduct in destroying certain tape recordings) on the ground, *inter alia*, that the defendant, at trial, had "raised no issue in connection with the tapes calling for a ruling or instruction by the trial court." Similarly, a defendant's attempt, on appeal, to change the foundation of his speedy trial motion from statutory to constitutional grounds was thwarted in *People v Lieberman* (47 NY2d 931, *supra; cf. People v Whisby*, 48 NY2d 834), while in *People v Booker* (49 NY2d 989, 990, *supra)*, a ground for suppression was held to be unavailable where the original motion "was not premised upon" the ground urged on the appeal (i.e., the failure to provide *Miranda* warnings; see, also, *People v Congilaro*, 60 AD2d 442, 448).

Moreover, the stringent approach adopted by the New York courts is not unique. The Second Circuit, for example, requires similar care in the preservation of the issues to be raised on appeal with the rule, *inter alia*, that "where a party has shifted his position on appeal and advances arguments available but not pressed below * * * and where that party has had ample opportunity to make the point in the trial court in a timely manner * * * *waiver will bar raising the issue on appeal*" (*United States v Braunig*, 553 F2d 777, 780, cert den 431 US 959; emphasis supplied). However, relief may be granted "for cause shown" (Fed Rules Crim Pro, rule 12, subd [f]; cf. CPL 470.15, subd 6, par [a]).

In *Braunig (supra)*, the denial of defendant's pretrial

suppression motion had turned upon the absence of any reasonable expectation of privacy towards items which had been seized from an apartment from which she had been evicted, but on appeal defendant sought, *inter alia*, to supplement her expectation-of-privacy argument by claiming that the underlying notice of eviction had been constitutionally defective *(United States v Braunig, supra*, pp 779-780). The transcript of the suppression hearing indicated that defense counsel had conceded "for the purpose of the argument" that the notice in question was not invalid, although the defendant apparently maintained that she had not actually received it at the time of the challenged search *(supra*, p 780). Under these circumstances, the Second Circuit held (p 780) that the concession had "abandon[ed]" the notice issue for purposes of the appeal. Similar results have ensued where a trial objection specified certain grounds to the implied exclusion of others (thereby foreclosing the possibility of correcting the error at trial) (see *United States v Fuentes*, 563 F2d 527, 531); where a pretrial motion was so broadly worded that it failed to particularize the ground later asserted in a manner which would have alerted the Trial Judge to its existence (see *United States v Indiviglio*, 352 F2d 276, 279-280, cert den 383 US 907); where a belated objection raised the prospect of a lengthy but avoidable midtrial interruption (see *United States v Chiarizio*, 525 F2d 289, 293-294); and where a position taken at trial was logically inconsistent with a ground asserted for the first time on the appeal (see *United States v Knuckles*, 581 F2d 305, cert den 439 US 986). Some indulgence has been shown, however, where the arguments urged on appeal have been raised "indirectly" in the court below, provided, *inter alia*, that defense counsel has contested the matter and there has been a full evidentiary inquiry into the factors deemed critical to a disposition of the issues (see *United States v Di Stefano*, 555 F2d 1094, 1099-1100).

In summary, then, we conclude in a general way that a question of law will be considered preserved for appellate review when it is interjected at the fact-finding level in such a manner and at such a time as to fairly apprise the court and the opposing party of the nature and scope of the

matter contested, and to allow the necessary evidentiary treatment and trial-level advocacy to be pursued. The failure to adequately preserve an issue in this manner would not, however, preclude our court from reviewing the matter in a proper case "[a]s a matter of discretion in the interest of justice" (CPL 470.15, subd 3, par [c]).

IV

With these principles in mind, we turn to the case at bar. At the instant hearing, appellant never sought, expressly or impliedly, to suppress his station house admissions on the ground now urged on appeal, i.e., that they constituted the poisoned fruits of an arrest without probable cause. Rather, the asserted basis for suppression at nisi prius was that the statements had been extracted from him by coercive police tactics while he was under the influence of "angel dust", and that they were not, therefore, the product of any voluntary waiver of his Fifth Amendment rights. By reason of the foregoing, neither appellant nor the People explored the issue of probable cause during their direct examination at the suppression hearing, and the question of the initial detention was broached only once—during the cross-examination of Detective Alexander. The limited purpose of that cross-examination, however, as evidenced by defense counsel's response to the People's objection, was to test the admissibility of the statement made by appellant to Alexander *at the scene of the arrest*, and there was never any indication that the testimony elicited from Alexander would be utilized as the basis for any Fourth Amendment attack upon the statements later given to Detective Rango and Assistant District Attorney McNew. Furthermore, when the prosecutor thereafter conceded that the defendants were in custody at the time of the initial street encounter and declared his intention to exclude the statement to Detective Alexander, appellant's attorney terminated his cross-examination of Alexander, rescinded his request for the detective's notes and other documents, and agreed with the prosecutor in open court that Alexander could "go back from whence he came", with the clear implication that his further attendance was no longer required.

In our view, the only reasonable interpretation to be

placed upon this sequence of events is that appellant relinquished his challenge to the existence of probable cause by abandoning this line of inquiry and dropping his demand for Alexander's continued presence. That this was also the People's—and the court's—interpretation is evidenced by the fact that the prosecutor never sought to recall Detective Alexander to the witness stand or to secure the testimony of Alexander's partner, who was the only other person who could testify as to the informant's reliability. For that matter, neither the court nor the parties touched upon the issue of probable cause throughout the remainder of the hearing, while appellant's attorney expressly stated that the balance of the hearing would be devoted to an inquiry into the alleged violation of defendant's Fifth Amendment rights.

As a result of appellant's limited foray into the question of probable cause, the People were "effectively deprive[d] * * * of a fair opportunity to present their proof on that issue" (see *People v Martin*, 50 NY2d 1029, 1031, *supra; People v Tutt*, 38 NY2d 1011, *supra*), thus resulting in an inadequate record upon which to determine the matter on this appeal. It is impossible, for example, under the well-known analysis in *Aguilar v Texas* (378 US 108), to determine whether the informant's veracity could have been established by proof of a history of providing accurate information to the detective (see, e.g., *McCray v Illinois*, 386 US 300, 303; *People v Earley*, 76 AD2d 335, 338), or whether the informant's "basis of knowledge", although admittedly not firsthand, derived from an otherwise creditable source (see *Spinelli v United States*, 393 US 410; *Adams v Williams*, 407 US 143; see, also, *People v Wirchansky*, 41 NY2d 130; *People v Elwell*, 50 NY2d 231; *People v Earley, supra*). Equally lacking is any evidentiary basis upon which to determine whether the primary taint of any illegal detention had become sufficiently attenuated by the time of the precinct house admissions to render those statements independently admissible (see *People v Martinez*, 37 NY2d 662; *Brown v Illinois*, 422 US 590; see, also, *People v Rogers*, 52 NY2d 527; *People v Stewart*, 41 NY2d 65, 70; *People v Jackson*, 64 AD2d 673, 676). We therefore conclude that the contention now pressed before us represents more than a mere change in emphasis from one "prong

of attack" to another or a simple "shift in theory" *(People v De Bour*, 40 NY2d 210, 215 *supra)*, but rather an attempt to resuscitate as a ground for reversal a distinct legal principle which appellant had heretofore abandoned to permanent repose. Since appellant did not fairly apprise the hearing court or the People that probable cause would form the basis for the suppression of his precinct house statements, and since the manner of his introduction (and subsequent withdrawal) of that issue at the suppression hearing did not permit the necessary evidentiary development or trial-level advocacy to occur, we conclude that the theory now advanced on appeal has not been preserved for review in accordance with CPL 470.05 (subd 2). (See *People v Miguel*, 53 NY2d 920; *People v Patterson*, 53 NY2d 829, *supra; People v Eccleston*, 78 AD2d 536, mot for lv to app den 52 NY2d 832; cf. *People v Le Mieux*, 51 NY2d 981.)[10]

We are aware, of course, that this court, unlike the Court of Appeals, has the discretionary power to consider issues which have not been preserved for review when the interests of justice so dictate (CPL 470.15; see, also, *People v Cona*, 49 NY2d 26, 33, *supra)*, and that ofttimes this power has been exercised in cases in which, for example, significant but unprotested trial errors have operated to deprive the defendant of a fair trial (see, e.g., *People v Alston*, 77 AD2d 906; cf. *People v Patterson*, 39 NY2d 288, *supra; People v Musolino*, 54 AD2d 22, 26, cert den 430 US 935). It would appear, however, that the case for discretionary treatment is less compelling where the matter which has not been preserved for appellate review concerns a search and seizure issue in a prosecution which has resulted in a conviction based upon legally sufficient trial evidence, or following an otherwise valid guilty plea, for the factual validity of the conviction itself is not implicated thereby (see 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 11.7, subd [d], pp 733-734). Moreover, a contrary determination often would "penalize

---

10. *People v Calhoun* (73 AD2d 972) is distinguishable on its facts, as the defendant therein actually raised the question of the legality of his arrest during oral argument at the conclusion of the suppression hearing, but "[t]he court held that the defendant's detention was not an arrest and, consequently, the People did not develop proof, and the court did not rule, on the question of whether the detention was supported by the requisite probable cause."

the Government for failing to introduce evidence on probable cause for arrest [or other matters bearing on the Fourth Amendment] when defendant's failure to raise an objection before or during trial seemed to make such a showing unnecessary" *(United States v Meadows,* 523 F2d 365, 368, cert den 424 US 970, quoted in 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 11.7, subd [d], p 735). Thus, in the instant case, it was appellant's decision *not* to pursue the question of probable cause at the hearing which rendered the record inadequate to review that issue (cf. *Sykes v United States,* 373 F2d 607, 612-613), and while it would be within our power to order a further hearing incidental to a discretionary review of the matter, we decline to do so here, especially in the light of appellant's subsequent plea of guilty. We may now consider the contentions concerning the validity of that guilty plea.

## V

 Appellant's attack upon the plea is twofold. First, he argues, in effect, that the plea allocution makes out an affirmative defense to felony murder in accordance with subdivision 3 of section 125.25 of the Penal Law, and that the court, therefore, should not have accepted it. Second, he claims that the plea itself was involuntary. In our view, neither of these contentions has merit.

 Beginning with a consideration of the first assignment of error, appellant admitted at the change of plea that he knew that codefendant Green was armed with a gun when the trio undertook to commit the instant robbery, so that the plea allocution specifically negates a principal requirement of the statutory defense, i.e., that the defendant "[h]ad no reasonable ground to believe that any other participant [in the crime] was armed with * * * a weapon" (Penal Law, § 125.25, subd 3, par [c]). Furthermore, contrary to appellant's suggestion, there is no requirement of any specific intent on the part of any given participant with respect to the homicidal act in a prosecution for felony murder (see Penal Law, § 125.25, subd 3).

 Turning, then, to his second contention, appellant maintains that his plea of guilty was not voluntarily en-

tered because the transcript of the change of plea tends to show that his decision to plead guilty was a direct result of the court's refusal to suppress his inculpatory statements. In particular, appellant contends that the court should not have accepted his guilty plea after he had stated for the record that he was pleading guilty because he felt that he would "come out lighter with the plea" and had "no other alternative", and because he "wouldn't stand a chance at trial" in view of the court's refusal to suppress his statements to Detective Rango and Assistant District Attorney McNew.[11] Accordingly, appellant would have us

11. Appellant's statements occurred in the context of the following colloquy:

"Q [BY THE COURT] Are you pleading guilty of your own free will?

"A [THE APPELLANT] Yes, because I have no other alternative either way.

"Q What do you mean you have no alternative?

"A I will come out lighter with a plea because of the confession and I wouldn't stand a chance at trial, the two of us.

"Q You knew that the crime was committed?

"A Yes.

"Q And you knew you had gone there to rob?

"A Yes.

"Q And you knew that somebody had been killed?

"A Yes.

"MR. MURPHY [Assistant District Attorney]: Your Honor, one other question. He knows he does have a choice to go to trial and stand trial before a jury of twelve people?

"MR. FARKAS [Appellant's Counsel]: Judge, he knows that.

"Q You know that if you go to trial, your sentence might be heavier?

"A It might be heavier.

"Q That's why you are pleading guilty?

"A Yes.

"Q You are pleading guilty because you are guilty?

"A Excuse me?

"Q You are pleading guilty because you know you are guilty? You know you are guilty of going to that place to rob and a man was killed in the course of the robbery, you know that? That's why you are pleading guilty?

"A Yes.

"THE COURT: Is that satisfactory?

"MR. MURPHY: Yes.

"Q Are you pleading guilty of your own free will?

"A Yes, I am.

"Q And you are pleading guilty because you know you are guilty?

"A Yes, I know I did it but you didn't suppress the statements and then I know I won't stand a chance at trial with the jury with the statements.

"Q Do you know that by your plea of guilty, you know you committed the crime of murder in the second degree as a felony murder and that you went there for the purpose of robbing?

"A Yes, I understand, Your Honor.

vacate the plea, which was premised upon a commitment made and honored to impose the minimum legal sentence of 15 years to life upon his conviction of murder in the second degree. This we decline to do.

We note at the outset that appellant's protestations during the plea proceedings rose no higher than an expression of discontent with the denial of his suppression motion, and did not evince any unwillingness on his part to enter the guilty plea given the hard fact that his inculpatory statements had already been ruled admissible. On the contrary, the record reveals that appellant was a willing participant in these proceedings, albeit one who made his ambivalence known. Thus, accepting as a fact that appellant's motive for pleading guilty was accurately reflected in his colloquy with the Justice presiding, we find that under the circumstances here present, the plea was valid.

"Q Now, you understand that your lawyer, the District Attorney and I have been discussing this case about your pleading guilty and I told your lawyer if you plead guilty before we started the case, before the jury, that I would consider giving you a sentence of fifteen years to life but if you did go to trial and the jury convicted you, then I would make no promises. Whatever the verdict was, I would go according to law; do you understand that?

"A Yes.

"Q We were discussing that question and I told that to your lawyer?

"A Yes. He discussed it with me.

"Q Did he tell you that?

"A Yes.

"THE COURT: Mr. Farkas, is that the substance of the promise I made?

"MR. FARKAS: Yes, Your Honor.

"THE COURT: I would give him the minimum I could give him, which is fifteen years to life?

"MR. FARKAS: Yes, Your Honor.

"THE COURT: Mr. Murphy, is that the sum and substance of the conversation that took place in your presence?

"MR. MURPHY: Yes, it is, Your Honor.

"Q Do you understand this is the minimum I could give you in a murder of this type; do you understand that?

"A Yes, I understand.

"Q And I made that promise to your lawyer if you plead guilty and admitted to the crime?

"A Yes.

"Q That's why you are pleading guilty?

"A Yes.

"Q Did anybody force you to take the plea?

"A Nobody forced me to take the plea, I did it of my own free will.

"Q You know you did it because you are guilty?

"A I also stated why."

There is, of course, no "mandatory catechism" which can insure the voluntariness of a guilty plea (see *People v Nixon*, 21 NY2d 338, cert den *sub nom. Robinson v New York*, 393 US 1067). Perhaps the best insurance in this regard is the knowledge and experience of the Judge at the change of plea, who sits in a preferred position to monitor at firsthand the factors which underlie it. Among the factors which may be considered relevant to the inquiry are (1) the quality of the representation received by the defendant, (2) the nature and seriousness of the underlying crime, (3) the legal sufficiency of the facts admitted by the defendant, (4) the evidence (if there be such) of a dispute as to the underlying facts, (5) the sufficiency of the indictment, and (6) the rationality of the plea bargain (see *People v Francis*, 38 NY2d 150; *People v Nixon, supra*).

Applying the foregoing to the case at bar, there is no indication that appellant received other than competent legal representation at the time of his change of plea. He relinquished his trial-related rights only after discussing the matter fully with his attorney, and stated for the record that he was pleading guilty of his own free will because he was, in fact, guilty, and not because he was being pressured or coerced into doing so. Moreover, in response to questioning by the court, appellant freely admitted his intent to commit the instant crime, his actual participation therein, his knowledge that codefendant Green was armed with a gun, the fact (as related to him by Green) that a man had been shot by Green in the course of the robbery, and his participation in the proceeds. Finally, appellant's own counsel indicated that he was satisfied with the plea allocution.

The record, then, is clear that appellant was not operating under any compulsion in admitting his guilt of the instant crime. The adverse ruling on his suppression motion and the prospect of receiving a minimum sentence merely explain appellant's motive for accepting the instant plea. Simply to have a motive, however, does not vitiate one's freedom to act or refuse to act upon it. If appellant felt dissatisfied with the terms of the proffered plea, his remedy

was to refrain from pleading guilty. This he did not do; and what he did we cannot undo for him.

Accordingly, the judgment should be affirmed.

HOPKINS, J. P., LAZER and GIBBONS, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered March 9, 1979, affirmed.