Appeal by the defendant from a judgment of the Supreme Court, Kings County (Mullen, J.), rendered May 5, 2008, convicting him of rape in the first degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of suppression of identification testimony.
Ordered that the judgment is reversed, on the law, the plea is vacated, the identification testimony is suppressed, and the matter is remitted to the Supreme Court, Kings County, for further proceedings consistent herewith.
On the day after the Supreme Court denied suppression of identification testimony, the defendant agreed to plead guilty to rape in the first degree in exchange for a promised determinate sentence of nine years of imprisonment. During the course of the ensuing plea allocution, the Supreme Court advised the defendant of the terms of its sentencing commitment, and briefly explained that he would be waiving his right to appeal, as follows:
“the court: Let me just put the whole plea on the record. You will be pleading guilty to rape in the first degree, with a promised sentence of nine years . . . There’s a period of something called post release supervision that follows it. And there are a couple of fines, which I do not have the authority to waive, of $270, but that will come out of inmate funds.
*567 “There’s a waiver of the right to appeal. What that means, the conviction here is final, that there is not a higher court you can take it to. Do you understand that?
“the defendant: The waiver—I mean the money fee, is this the same fee that—
“the court: There will be one in each county.
“[defense counsel]: They will take it out of inmate funds.
“the court: Do you understand that?
“the defendant: Yes.
“the court: Now, do you read and write English, sir?
“the defendant: Yes.”
Although the defendant was asked directly by the Supreme Court whether he understood the nature of the waiver of the right to appeal, the defendant instead responded by asking the Supreme Court a question about the mandatory fees that would be imposed upon him as a result of his conviction. The defendant did not acknowledge in any manner that he understood the nature of the waiver. After both the Supreme Court and defense counsel attempted to clarify the fee issue, the Supreme Court asked the defendant whether he understood the explanation, and he replied “yes.” The defendant further stated, in response to the Supreme Court’s inquiry, that although he had previously been confined to a hospital for mental illness, he now felt well psychologically. At the conclusion of the plea allocution, the Supreme Court asked whether a written waiver of the right to appeal had been signed, and defense counsel handed the Supreme Court a waiver form, stating that the defendant had executed the waiver form, and that counsel had witnessed it. Nowhere in this record is there any indication that, prior to signing the waiver, the defendant had been advised of his right to take an appeal, that the defendant understood the nature of the waiver, or that the defendant’s waiver was executed voluntarily and knowingly. To the contrary, the defendant claimed, at sentencing, that his attorney had coerced him into pleading guilty and had misinformed him of the consequences of doing so, and claimed that his attorney had not provided him “with the proper paperwork,” but instead led him to believe that he would “receive a MICA [Mental Illness and Controlled-Substance Abuse] therapeutic program.” Additionally, the Supreme Court did not question the defendant about the writ *568 ten waiver, and did not ascertain on the record that he understood its contents.
On appeal, the defendant contends that his waiver of the right to appeal is not enforceable because the Supreme Court provided virtually no explanation regarding the waiver and took no measures to ensure that he, a first felony offender with a history of mental illness, understood it and was validly waiving his right to appeal. We agree.
In People v Seaberg (74 NY2d 1, 10 [1989]), the Court of Appeals first recognized that “the public interest concerns underlying plea bargains generally are served by enforcing waivers of the right to appeal,” observing that “the negotiating process serves little purpose if the terms of a carefully orchestrated bargain can subsequently be challenged” (internal quotation marks omitted). However, “the Seaberg opinion makes clear that a waiver of the right to appeal will not be enforced unless it was knowingly, intelligently and voluntarily made” (People v Callahan, 80 NY2d 273, 280 [1992], citing People v Seaberg, 74 NY2d at 11). This determination must be made in the first instance by the trial court, which is in the best position to assess all of the relevant factors, including the reasonableness of the bargain, and the age and experience of the accused (see People v Callahan, 80 NY2d at 280; People v Seaberg, 74 NY2d at 11). Appellate courts are also entrusted with the responsibility to oversee the plea bargaining process, and must examine the record to ensure that the defendant’s waiver of the right to appeal reflects a knowing and voluntary choice (see People v Callahan, 80 NY2d at 280). “While there is no requirement that the trial court engage in any particular litany in order to satisfy itself that these standards have been met, a knowing and voluntary waiver cannot be inferred from a silent record” (People v DeSimone, decided sub nom. People v Callahan, 80 NY2d at 283).
In People v DeSimone, the prosecutor informed the trial court that the defendant had signed a written waiver of the right to appeal his sentence as. a condition of his plea agreement. However, the court made no mention of the written waiver during the plea allocution. In finding that the waiver was unenforceable, the Court of Appeals noted that there was no record discussion between the trial court and the defendant concerning the waiver, and that the trial court had not even made an attempt “to ascertain on the record an acknowledgment from defendant that he had, in fact, signed the waiver or that, if he had, he was aware of its contents” (People v DeSimone, 80 NY2d at 283). Furthermore, there was nothing on the record to establish that *569 the trial court was familiar with the circumstances surrounding the execution of the written waiver. Under these circumstances, the Court of Appeals concluded that “there is no assurance that the waiver was executed under constitutionally acceptable circumstances” (id.).
In the case at bar, we are mindful of the fact that the written waiver signed by the defendant recited that he had been advised by the Supreme Court and by his attorney of the “nature of the rights” he was giving up, and explained that the right to appeal included, inter alia, the right to prosecute the appeal as a poor person, the right to have an attorney assigned in the event the defendant was indigent, and the right to submit a brief and/or argue before an appellate court any issues relating to the defendant’s conviction and sentence. Contrary to the conclusion reached by the dissent, we find, and the Court of Appeals has held, that a written waiver is not a complete substitute for an on-the-record explanation of the nature of the right to appeal, and some acknowledgment that the defendant is voluntarily giving up that right. Here, the Supreme Court did not, as the dissent concludes, engage in a “detailed inquiry” of the defendant but instead, explained the waiver of the right to appeal in an extremely perfunctory manner. Indeed, the Supreme Court merely stated that “the conviction here is final, that there is not a higher court you can take it to.” While a detailed written waiver can supplement a trial court’s on-the-record explanation of what a waiver of the right to appeal entails, and clarify possible ambiguities in that explanation (see People v Ramos, 7 NY3d 737, 738 [2006]), the execution of a written waiver does not, standing alone, provide sufficient assurance that the defendant is knowingly, intelligently, and voluntarily giving up his or her right to appeal as a condition of the plea agreement.
Furthermore, despite the fact that the subject waiver form stated that it was signed after the Supreme Court advised the defendant of the “nature of the rights” he was giving up, there is no indication in the record that this was indeed the case. Rather, it appears that the defendant signed the written waiver prior to the commencement of the plea proceeding. Finally, in evaluating whether the record is sufficient to demonstrate a knowing, intelligent, and voluntary waiver of the right to appeal, it cannot be overlooked that, at the time he entered his plea, the 23-year-old defendant had never previously been convicted of a felony, and that he suffered from mental illness to such a severe degree that the prosecution was delayed on several occasions because of findings that he was unfit to proceed. Additionally, nowhere in the record did the defendant explicitly *570 state that he waived his right to appeal. Considering all of these circumstances, we cannot conclude on this record that the defendant understood the implications of the waiver of the right to appeal, and voluntarily agreed to it. Accordingly, the waiver is unenforceable (see People v Callahan, 80 NY2d at 283; People v Malloy, 8 AD3d 679 [2004]; People v Folks, 306 AD2d 355 [2003]; People v Dongo, 244 AD2d 353 [1997]; People v Gladden, 267 AD2d 400 [1999]; People v McCaskell, 206 AD2d 547, 548 [1994]).
In the absence of a knowing, intelligent, and voluntary waiver of the right to appeal, the defendant retains his right to challenge the denial of suppression of the complainant’s lineup identification as the fruit of an illegal arrest (see CPL 710.70 [2]; People v Brown, 24 AD3d 565, 566 [2005]; People v Malloy, 8 AD3d 679, 680 [2004]). Turning to the merits, we agree with the defendant’s contention that the hearing record is inadequate to establish that his arrest was supported by probable cause.
“It is axiomatic that an officer may only seize and take into custody an individual when the officer has probable cause to believe that the person has committed a crime” (People v Diaz, 131 AD2d 690, 694 [1987]; see People v De Bour, 40 NY2d 210 [1976]; People v Dawkins, 163 AD2d 322, 323 [1990]). While probable cause does not require the same quantum of proof necessary to support a conviction (see People v Bigelow, 66 NY2d 417, 423 [1985]; People v McCray, 51 NY2d 594, 602 [1980]), it does require the existence of facts and circumstances which, viewed together, would lead a reasonable person possessing the same expertise as the arresting officer to conclude that an offense has been or is being committed, and that the defendant committed or is committing that offense (see People v Kennedy, 282 AD2d 759, 760 [2001]; People v Dawkins, 163 AD2d at 324; People v White, 117 AD2d 127, 131 [1986]).
In this case, two witnesses testified on behalf of the prosecution at the brief suppression hearing: Detective Joseph Lindor, who conducted the lineup identification procedure, and Detective Edward Narvaez, who was involved in the investigation. As is relevant to the issue of probable cause, Detective Lindor testified that the complainant described her assailant as “a male black, approximately six feet tall, dark clothing, hooded sweat shirt, do-rag.” However, a complaint report prepared by another officer listed the perpetrator’s height as five feet, nine inches, and a summary prepared by an assistant district attorney described the suspect as five feet, seven inches. According to Detective Lindor, the defendant’s arrest report indicated that he was actually six feet, one inch tall.
*571 The second witness, Detective Narvaez, testified that he first became involved in the case on the afternoon of May 13, 2004, when he and another detective interviewed Emanuel Aviles. Aviles was employed as a security guard at a large housing complex known as Linden Plaza, and was on duty when the subject rape occurred at about 2:50 a.m. on May 11, 2004. Detective Narvaez recounted that Aviles told him that “at that particular time he was walking in the plaza when he saw a male by the security booth. He said that he recognized this male as a person who lives in his neighborhood. He went on to say that this particular male also went to Beach Channel High School and that this person was also on the basketball team of Beach Channel High School.” According to Detective Narvaez, Aviles believed that the defendant was connected to the incident because “[h]e saw him by the security booth,” and the crime took place in the “vicinity” of the security booth. After speaking to the detectives, Aviles agreed to accompany them to Beach Channel High School, where he identified the defendant’s photograph from a 2002 yearbook. Based upon Aviles’s identification, Detective Lindor generated an “inquiry card” and asked that his office be notified if the defendant were stopped, apprehended, or identified. On May 18, 2004, Lindor was notified that the defendant was arrested in the 101st Precinct in Queens. Lindor arranged for the defendant to be transported to Brooklyn. When he arrived, the defendant was arrested by Lindor for the rape. The record is devoid of any evidence that the defendant was arrested in Queens for anything other than the Brooklyn rape charge at issue here.
In concluding that the defendant’s arrest was supported by probable cause, the Supreme Court stated that “this crime took place at the Linden Plaza apartment complex, and the individual was seen right where the event happened.” The Supreme Court also emphasized that Aviles recognized the defendant as someone who used to play basketball.
Contrary to the Supreme Court’s determination, the evidence that the defendant was seen near the security booth of a large apartment complex, in the vicinity of the location where the rape occurred, did not rise to the level of probable cause. “It is well settled that . . . the mere presence of an individual at a scene of criminal activity . . . without any other indicia of criminal activity” is insufficient to establish probable cause (People v Sanchez, 276 AD2d 723, 724 [2000]). Here, there was no additional indicia of criminal activity beyond the defendant’s presence in the vicinity of the crime scene. There was no detailed description of the perpetrator, and no evidence that the defend *572 ant matched the general description given by the complainant except for race and height. While the complainant did indicate that the perpetrator was wearing dark clothing, a hooded sweatshirt, and a do-rag, the record is devoid of any indication of what the defendant was wearing when Aviles observed him near the security booth.
Moreover, the prosecutor elicited no testimony that the defendant was engaged in any type of furtive or suspicious conduct when Aviles saw him near the security booth. Further, while the crime took place late at night, there is no evidence that the grounds surrounding the apartment complex were deserted or that the defendant was the only individual in the vicinity. On this poorly developed record, we cannot conclude that the prosecution sustained its burden of establishing probable cause (see People v Hargroves, 296 AD2d 581, 582 [2002]; People v Sanchez, 276 AD2d at 723; People v Sellers, 168 AD2d 581, 582 [1990]; People v Yiu C. Choy, 173 AD2d 883, 884 [1991]; People v Dawkins, 163 AD2d at 324; People v White, 117 AD2d at 131-132).
The dissent concludes that “[n]othing in the record remotely suggests that the defendant’s arrest in Queens was pursuant to Lindor’s ‘inquiry card,’ or had anything to do with the Brooklyn charges at issue here” and that, consequently, whether the police had probable cause to arrest the defendant for the rape which occurred in Brooklyn is “irrelevant.” We disagree with this reasoning, since it was the People who had the burden of coming forward with evidence establishing that probable cause existed for the defendant’s arrest and that he, therefore, was lawfully in custody when he was placed in the lineup (see People v Dodt, 61 NY2d 408, 415, 417 [1984]). Detective Lindor testified that he arrested the defendant for the rape just prior to placing him in the lineup. If the People’s theory was that the defendant was lawfully in custody, not on the basis of that arrest, but on the basis of an earlier arrest in Queens, it was their burden to come forward with evidence that the Queens arrest was lawful. Detective Lindor’s bare statement that he was informed that the defendant had been arrested in Queens is insufficient to establish that the defendant was arrested on independent charges unrelated to the subject offense and that the Queens arrest was supported by probable cause.
Since the defendant’s arrest was unlawful, any testimony that the complainant identified him in a lineup should have been suppressed as the fruit of illegal police conduct (see People v Gethers, 86 NY2d 159, 162 [1995]; People v Dodt, 61 NY2d at 417). Accordingly, we vacate the defendant’s plea of guilty, and *573 remit the matter to the Supreme Court, Kings County, for further proceedings, including a hearing to determine whether an independent source exists to support an in-court identification of the defendant by the complainant (see People v Gethers, 86 NY2d at 163; People v Dodt, 61 NY2d at 417; People v Sanchez, 276 AD2d at 724; People v Dawkins, 163 AD2d at 325).
We further note, as the People correctly concede, that because the crime was committed prior to the effective date of the amendment to Penal Law § 60.35 providing for the imposition of a supplemental sex offender fee, that fee should not have been imposed upon the defendant (see Penal Law § 60.35 [1] [b]; People v Rodriguez, 30 AD3d 1143, 1144 [2006]). Thus, in the event that the defendant is resentenced, the supplemental sex offender fee should not be imposed.
In light of our determination, we need not reach the defendant’s alternate argument that the Supreme Court erred in denying his motion to withdraw his plea of guilty without assigning new counsel. Eng, Hall, and Austin, JJ., concur.
Fisher, J.P. dissents and votes to modify the judgment, by deleting the provision thereof imposing a supplemental sex-offender victim fee, and, as so modified, to affirm the judgment, with the following memorandum, in which Miller, J., concurs:
Because I conclude that the defendant knowingly, voluntarily, and intelligently waived his right to appeal, and that, even if he did not, the Supreme Court correctly denied suppression of identification evidence, I respectfully dissent, and vote to modify the judgment only to the extent of vacating the provision requiring payment of a supplemental sex offender victim fee.
In the early morning hours of May 11, 2004, near 308 Sheridan Avenue in Brooklyn, the defendant accosted the complainant, grabbed her around the neck, pointed a knife at her, and demanded money. When she told him that she had none, he pulled her into a nearby yard and raped her at knife point. Approximately one week after the crime, the complainant identified the defendant in a lineup, the fairness of which has never been challenged. The grand jury returned an indictment charging the defendant with rape in the first degree, sexual abuse in the first degree, sexual misconduct, attempted robbery in the first degree, two counts of assault in the second degree, two counts of assault in the third degree, and criminal possession of a weapon in the fourth degree. He sought suppression of the complainant’s potential identification testimony on the ground that, prior to the lineup, the police lacked probable cause to arrest him for the crimes committed against the complainant.
*574 At the Dunaway hearing (see Dunaway v New York, 442 US 200 [1979]), two retired detectives, Joseph Lindor and Edward Narvaez, who had been assigned to the Brooklyn Special Victims Squad, testified for the People; the defendant offered no evidence. The detectives testified that they were assigned to the investigation of the crimes here in issue. Two days after the incident, Narvaez interviewed a person who had been working as a security guard in the vicinity of the incident on the date and at the approximate time it occurred. He told Narvaez that he had seen a man in the area whom he recognized as someone who lived in his neighborhood and had played on the basketball team at Beach Channel High School. The man matched the general description of the assailant provided by the complainant. The witness accompanied Narvaez to Beach Channel High School and looked through three or four school yearbooks. In the 2002 yearbook, he came upon the defendant’s photograph, pointed to it, and said, “that’s him.”
As a result of that identification, Detective Lindor “put out what is called an inquiry card with reference to [the defendant], that if he’s stopped, apprehended or identified, [Lindor’s] office would be notified.” On May 18, 2004, only one week after the crime, Lindor “was notified that [the defendant] was arrested” in the 101st Precinct in Queens. Lindor had the defendant transported to Brooklyn and, when he arrived, Lindor “arrested” him for the rape. He arranged for the defendant to stand in a lineup, and had the complainant brought to the precinct station house. She viewed the lineup and identified the defendant , as her attacker.
At the conclusion of the hearing, defense counsel conceded that the lineup itself was not unduly suggestive. Nevertheless, he argued that the identification evidence should be suppressed because discrepancies in the physical descriptions of the perpetrator undermined any probable cause the detectives had to arrest the defendant and place him in a lineup.
The Supreme Court denied suppression of the identification testimony, and the case was set down for trial. The next day, however, the People and the defendant reached a plea agreement. In exchange for his plea of guilty to the single charge of rape in the first degree in full satisfaction of the indictment, the defendant would receive a determinate nine-year prison term, which would run concurrently with sentences to be imposed in connection with his unrelated pending cases, one in the Bronx— where he had been indicted for first-degree criminal sexual act—and the other in Queens—where he had been indicted for first-degree rape and robbery. Defense counsel offered the plea as follows:
*575 “[defense counsel]: After continued negotiations with the People and discussions with the Court and my client, he’s authorized me to withdraw his previously entered pleas of not guilty and enter a plea of guilty to count one of the indictment, rape in the first degree. His understanding being a promised sentence of nine years, concurrent with his cases in Queens and in the Bronx.
“He understands he’s giving up his right to a trial and the rights that go along with that. I believe he does so knowingly, intelligently and voluntarily at this time, Judge.”
After some further colloquy, the defendant was sworn, and the record continues as follows:
“the court: Let me just put the whole plea on the record. You will be pleading guilty to rape in the first degree, with a promised sentence of nine years, to run concurrent with whatever you get in Queens and the Bronx. There’s a period of something called post release supervision that follows it. And there are a couple of fines, which I do not have the authority to waive, of $270, but that will come out of inmate funds.
“There’s a waiver of right to appeal. What that means, the conviction here is final, that there is not a higher court you can take it to. Do you understand that?
“the defendant: The waiver—I mean the money fee, is this the same fee that—
“the court: There will be one in each county.
“[defense counsel]: They will take it out of inmate funds.
“the court: Do you understand that?
“the defendant: Yes.
“the court: Now, do you read and write English, sir?
“the defendant: Yes.”
The Supreme Court then explained to the defendant that he was, by pleading guilty, accepting a conviction and waiving the rights he would ordinarily enjoy at trial, including the right to have a jury present, the right to testify in his own behalf if he chose to do so, the right to hear and question witnesses who testified against him, and the right to call his own witnesses. The defendant stated that he understood. After consulting with his attorney, the defendant also stated that he understood the possibility that a civil confinement proceeding could be *576 instituted against him following the completion of his prison term. The defendant acknowledged that no other promises had been made to him in connection with his plea of guilty and that he was pleading guilty of his own free will. He admitted that he had forcibly raped the complainant.
At the conclusion of the proceedings, and after a sentencing date had been selected, the Supreme Court asked whether a written waiver of appeal had been signed. Defense counsel replied: “Handing up to the Court, your Honor, the waiver of right to appeal executed by [the defendant] and witnessed by myself as his attorney.”
The written waiver of appeal contained three sections. The first, under which the defendant signed his name, read:
“I hereby waive my right to appeal. I execute this waiver after being advised by the court and my attorney of the nature of the rights I am giving up. I have been advised of my right to take an appeal (CPL 450.10), to prosecute the appeal as a poor person and to have an attorney assigned in the event that I am indigent, and to submit a brief and/or argue before an appellate court on any issues relating to my conviction and sentence.
“I make this waiver voluntarily, knowingly and of my own free will.”
The second section, under which defense counsel signed his name, read:
“I represent that prior to the signing of the foregoing waiver, the above-named defendant was fully advised of the rights of a convicted person to take an appeal under the laws of the State of New York.
“I further represent that, in my professional opinion, the above waiver by the defendant of the right to appeal was voluntarily and knowingly made and recommend to the Court that the waiver be approved.”
The third section was signed by the court. It read: “Having examined the defendant in open court and on the record, it is the Court’s opinion that the defendant has knowingly and freely waived the right to appeal. Waiver is approved.”
When the defendant appeared for sentencing, he addressed the Supreme Court personally and moved to withdraw his plea. He claimed that his attorney had coerced him into pleading guilty and had misinformed him of the consequences of doing so. Specifically, he claimed that his attorney had not provided him “with the proper paperwork,” and had led him to believe that he would “receive a MICA [Mental Illness and Controlled-Substance Abuse] therapeutic program.” He made no mention *577 of the waiver of appeal. Counsel asserted that he had never discussed a MICA program with the defendant. The Supreme Court denied the defendant’s motion to withdraw the plea, and sentenced him in accordance with the promise made at the time of the plea.
Thereafter, notwithstanding the waiver of appeal, the defendant appealed to this Court. He argues that (1) the appeal waiver was not effective, (2) at the suppression hearing, the people failed to meet their burden of going forward with evidence of probable cause for his arrest and that, consequently, evidence of the lineup should have been suppressed as the fruit of an unlawful arrest, and (3) he was deprived of the effective assistance of counsel when his attorney took a position adverse to his on the motion to withdraw the plea of guilty.
My colleagues in the majority agree with the defendant that he did not effectively waive his right to appeal. I find that he most certainly did.
Our Court of Appeals has held that, even in the face of an ambiguity in a plea colloquy regarding the nature and effect of an appeal waiver, a defendant will be found to have knowingly, intelligently, and voluntarily waived the right to appeal where he or she executes a detailed written waiver that states that the defendant has the right to appeal, explains the appellate process, and confirms that defense counsel fully advised the defendant of his or her right to take an appeal under the laws of the State of New York (see People v Ramos, 7 NY3d 737, 738 [2006]; see also People v Tinsley, 72 AD3d 1284, 1285 [2010] [“defendant’s written waiver of his right to appeal is valid despite County Court’s minimal inquiry regarding it”]; People v Ellis, 69 AD3d 756 [2010]; People v Morrow, 48 AD3d 704, 705 [2008]; People v Campbell, 38 AD3d 677, 678 [2007]). Here, in an effort to “put the whole plea on the record,” the Supreme Court explained to the defendant the charge to which he would be pleading guilty, the sentence he would receive, the fact that the sentence would be concurrent with sentences in cases pending in different counties, the fines that would be imposed, and how those fines would be paid. The Supreme Court further explained that there would be a waiver of the defendant’s right to appeal which, as the Supreme Court told the defendant, meant that “the conviction here is final, that there is not a higher court [that the defendant] can take it to.” Asked if he understood what the Supreme Court had said, the defendant inquired only about the fines and, after a further explanation regarding them, stated that he understood. The counseled defendant asked no questions regarding the Supreme Court’s *578 explanation of the waiver of appeal, any more than he did of the Supreme Court’s explanation of the charge to which he would be pleading guilty, the sentence he would receive, or the fact that the sentence would be concurrent with sentences in cases pending in different counties. The defendant had but one question, regarding the fines.
Moreover, defense counsel thereafter submitted the written waiver of appeal in which the defendant, who had told the Supreme Court on the record that he could read and write English, acknowledged that he had been advised of his right to take an appeal, to prosecute it as a poor person and to have an attorney assigned in the event that he was indigent, and to submit a brief to an appellate court on any issues relating to his conviction and sentence, and affirmed that he was voluntarily, knowingly, and of his own free will waiving his right to appeal. And, in the same written waiver form, defense counsel, who had negotiated the plea on the defendant’s behalf, made an unequivocal representation, first that, prior to signing the waiver, the defendant had been fully advised of the rights of a convicted person to take an appeal under the laws of the State of New York, and second that, in the attorney’s professional opinion, the defendant executed the waiver of appeal voluntarily and knowingly. And, finally, the written, waiver further contained a statement by the Supreme Court that, having examined the defendant in open court and on the record, it was also of the opinion that the defendant knowingly and freely waived the right to appeal.
My colleagues in the majority, however, find this insufficient. They reach this conclusion despite the facts that: (1) the defendant asked questions at his allocution but none about the Supreme Court’s oral warning that “[t] here’s a waiver of right to appeal [and w]hat that means [is that] the conviction here is final, that there is not a higher court you can take it to”; (2) the waiver form was witnessed by the attorney who had negotiated the plea bargain for the defendant, the defendant signed a statement that he “waiv[ed his] right to appeal . . . after being advised by the court and [his] attorney of the nature of the rights [he was] giving up [including his] right to take an appeal . . . , to prosecute the appeal as a poor person and to have an attorney assigned in the event that [he was] indigent, and to submit a brief and/or argue before an appellate court on any issues relating to [his] conviction and sentence . . . [and that he was making] this waiver voluntarily, knowingly and of [his] own free will”; (3) the defendant’s attorney executed a document and submitted it to the court representing that, “prior to the *579 signing of the . . . waiver, the . . . defendant was fully advised of the rights of a convicted person to take an appeal under the laws of the State of New York [and that, in the attorney’s] “professional opinion, the . . . waiver by the defendant of the right to appeal was voluntarily and knowingly made”; and (4) the justice at sentencing, who had presided over the plea proceeding and had explained to the defendant that there would be a waiver of appeal and what that meant, executed a document which stated that, after “[h]aving examined the defendant in open court and on the record, [the judge was of the] opinion that the defendant has knowingly and freely waived the right to appeal.”
I must respectfully disagree with my colleagues. In my view, the foregoing clearly and sufficiently establishes that the defendant knowingly, voluntarily, and effectively waived his right to appeal, thereby foreclosing appellate review of the denial of suppression of identification evidence (see People v Kemp, 94 NY2d 831, 833 [1999]; People v Pena, 73 AD3d 1216 [2010]; People v Morant, 61 AD3d 779 [2009]). Indeed, in a case like this, the type of detailed inquiry that the majority would have the plea court conduct to establish orally and on the record the full extent of the defendant’s understanding of the appeal waiver would render a written waiver entirely superfluous and leave the Court of Appeals’ holding in People v Ramos (7 NY3d 737 [2006]) largely without force or effect. I cannot join the majority in reaching such a result.
Although I have concluded that the defendant effectively waived his right to appeal and that his waiver forecloses our review of the denial of suppression of identification testimony, I nevertheless address the merits of the suppression ruling because my colleagues in the majority, having found the waiver of appeal ineffective, also hold that the identification evidence should have been suppressed. Once again, I respectfully disagree.
At the suppression hearing, the defendant argued only that, because of discrepancies in the descriptions of the perpetrator, Detective Lindor did not have probable cause to arrest him for the Brooklyn attempted robbery and rape and, therefore, that the lineup identification was the suppressible fruit of an unlawful arrest. On appeal, the defendant advances the same argument, contending that “the People utterly failed to meet their burden of establishing probable cause to believe that [the defendant] committed the rape.” The majority agrees and holds that, “[s]ince the defendant’s arrest was unlawful, any testimony that the complainant identified him in a lineup must *580 be suppressed as the fruit of illegal police conduct.” I respectfully disagree with the conclusion that, because Detective Lindor lacked probable cause to arrest the defendant for this crime before placing him in a lineup, suppression is required. Indeed, I am of the view that, on the record before us, the question of whether Detective Lindor had probable cause to arrest the defendant is entirely irrelevant to whether the defendant was lawfully placed in the lineup.
The majority concludes that the information provided by the security guard as to what he saw on the night in question, and his identification of the defendant’s yearbook photograph as portraying the man he had seen, did not provide the police with probable cause for the defendant’s arrest for the Brooklyn crimes. I agree, and, apparently, so did Detective Lindor. Had the detective believed that he had probable cause to believe that the defendant committed the rape and attempted robbery, he would have undoubtedly sought an arrest warrant. There is no evidence that he did. Instead, he issued an “inquiry card.”
The “inquiry card” he sent out did not direct, request, or authorize the defendant’s arrest for the charges under investigation. According to the detective’s unchallenged hearing testimony, the “inquiry card” merely asked that Lindor’s office be notified in the event that the defendant were “stopped, apprehended or identified.” Lindor testified that he received notification, a week after the crime in Brooklyn, that the defendant had been “arrested . . . [i]n Queens, the 101st Precinct.” Nothing in the record remotely suggests that the defendant’s arrest in Queens was pursuant to Lindor’s “inquiry card,” or had anything to do with the Brooklyn charges at issue here. To the contrary, the record indicates that the defendant was charged and indicted in Queens for an unrelated first-degree rape and robbery. The majority, however, concludes otherwise, notwithstanding that the only evidence in the record before us is the sworn testimony of Detective Lindor that, on May 18, 2004, he “was notified that [the defendant] was arrested” in the 101st Precinct in Queens.
Because Detective Lindor’s “inquiry card” did not direct, request, or authorize the defendant’s arrest for the charges under investigation in Brooklyn, and because there were rape charges lodged against him in Queens, I think it is clear that the People came forward at the hearing with evidence in the first instance sufficient to show that, when the defendant was brought to Brooklyn to stand in the lineup, he was not being detained on the basis of the crimes Lindor was investigating, but on the unrelated charges lodged against him in Queens. *581 And if the defendant was identified in Brooklyn while lawfully detained on the Queens charges, the identification was not the product or direct consequence of an illegal detention (cf. People v Jones, 2 NY3d 235, 243, 244 [2004]; People v Dodt, 61 NY2d 408, 417 [1984]).
It is certainly true that the People did not introduce any evidence at the hearing on the question of the lawfulness of the defendant’s arrest in Queens. Nonetheless, the defendant never challenged that arrest although Detective Lindor mentioned it at the hearing and, therefore, never gave notice to the trial court or to the People that the lawfulness of the Queens arrest was in issue. Consequently, the defendant failed to preserve any claim that, at the time of the lineup, he was not lawfully in police custody because the Queens arrest was unlawful (see People v Vasquez, 66 NY2d 968, 970 [1985], cert denied 475 US 1109 [1986]; People v Volpe, 60 NY2d 803, 805 [1983]; People v Jones, 81 AD2d 22, 44 [1981]). Additionally, he has not made any such claim on appeal (cf. People v Smith, 249 AD2d 426 [1998]). Accordingly, in my view, because the defendant did not establish that he was unlawfully in custody at the time of the lineup identification in Brooklyn, suppression of identification evidence was properly denied (see People v James, 72 AD3d 844 [2010]).
The defendant’s claim that he was denied the effective assistance of counsel when his attorney denied having ever discussed a MICA program with him is without merit. Although counsel’s statement was adverse to the defendant’s position, the Supreme Court clearly rejected the defendant’s motion to withdraw his plea based on the record of the plea proceeding during which the defendant, under oath, answered “No” to that court’s question, “Now, other than what I have already promised you, which is the nine years, with my recommendation of concurrent sentencing, five years post release supervision, waiver of right to appeal, and $270 in fees and fines, has anybody else made any other promises to you in order to get you to plead guilty?” Thus, the Supreme Court’s denial of the defendant’s application to withdraw his plea was not influenced by defense counsel’s statement, and reversal is therefore not required (see People v Rogers, 43 AD3d 1189, 1190 [2007]).
Finally, inasmuch as I agree that the retroactive imposition of the supplemental sex offender victim fee was improper and that the defendant’s challenge to it is not covered by his waiver of appeal (see People v Callahan, 80 NY2d 273, 280 [1992]; People v Jennings, 60 AD3d 694 [2009]), I would modify the judgment by vacating the provision imposing the supplemental sex offender victim fee, and I would otherwise affirm.